COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judge Benton and
         Senior Judge Duff
Argued at Alexandria, Virginia


JESSE L. PARK
                                          OPINION BY
v.   Record No. 2915-98-4      JUDGE JAMES W. BENTON, JR.
                                          MAY 2, 2000
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                  Dennis J. Smith, Judge

          Marvin D. Miller (Law Offices of Marvin D.
          Miller, on briefs), for appellant.

          Marla Graff Decker, Assistant Attorney
          General (Mark L. Earley, Attorney General, on
          brief), for appellee.


     Jesse L. Park entered a conditional plea of guilty to

possession of cocaine with the intent to distribute, reserving

the right to appeal the trial judge's rulings on two pretrial

motions.  On appeal, Park contends (1) the trial judge erred in

denying his motion to suppress evidence obtained during the

execution of a search warrant, and (2) he was denied due process

of law when a circuit court judge granted the Commonwealth's ex

parte request to release evidence seized during the execution of

the search warrant.  For the reasons that follow, we reverse

Park's conviction and remand for a new trial.

I.

Based upon the affidavit of Detective J.A. Longerbeam, the Fairfax County police obtained a warrant to search the residence of Leah Steele and Jesse Park for cocaine and items related to distribution of cocaine. Longerbeam, approximately nine narcotics officers, and between ten and fifteen officers from the tactical team assembled to execute the search warrant. At approximately 7:00 p.m., Longerbeam, who was wearing blue jeans and no police identification, knocked on the apartment door. The tactical team hid to the side of the door on Longerbeam's right. The tactical team wore all black garments, including hoods to cover their faces, and armored vests.

Park, who was in the apartment with Steele's two-year-old son, opened the door. Longerbeam neither identified herself as a police officer nor said she had a search warrant. Instead, she said something like, "I'm sorry." Longerbeam testified that Park then diverted his eyes in the direction of the tactical team and attempted to shut the door. Longerbeam put her umbrella in the door to keep it from closing. The tactical team then rushed into the apartment while simultaneously announcing, "tactical team for a search warrant," or, "police, search warrant." During the search, the police seized crack cocaine, currency, and other items. The police arrested Park after the search and seizures.

II.

"Police officers 'may not forcibly break into dwellings as a matter of course to execute a [search] warrant.'" Hargrave v. Commonwealth, 21 Va. App. 320, 323, 464 S.E.2d 176, 177 (1995) (quoting Commonwealth v. Viar, 15 Va. App. 490, 493-94, 425 S.E.2d 86, 88 (1992)). "'Generally, police officers, before resorting to forced entry into premises to be searched under warrant, must attempt to gain admittance peaceably by announcing their presence, identifying themselves as police officers[,] and stating their purpose.'" Wynne v. Commonwealth, 15 Va. App. 763, 765, 427 S.E.2d 228, 230 (1993) (quoting Heaton v. Commonwealth, 215 Va. 137, 138, 207 S.E.2d 829, 830 (1974)). More specifically, "the police, prior to forcing entry into a dwelling [, must do the following]: (1) knock; (2) identify themselves as police officers; (3) indicate the reason for their presence; and (4) wait a reasonable period of time for the occupants to answer the door." Gladden v. Commonwealth, 11 Va. App. 595, 598, 400 S.E.2d 791, 793 (1991); see also Miller v. United States, 357 U.S. 301, 308-09 (1958). This is known as the "knock and announce rule." Hargrave, 21 Va. App. at 325, 464 S.E.2d at 178.

The Supreme Court of Virginia explained the purpose of the knock and announce rule as follows:

> The reasons for the requirement of notice of purpose and authority have been said to be that the law abhors unnecessary breaking or destruction of any house, because the

> dweller in the house would not know the
> purpose of the person breaking in, unless he
> were notified, and would have a right to
> resist seeming aggression on his private
> property.

Johnson v. Commonwealth, 213 Va. 102, 104, 189 S.E.2d 678, 679 (1972).  Thus, implementation of the rule "discourages violence and volatile confrontations and encourages orderly executions of search warrants."  Hargrave, 21 Va. App. at 323, 464 S.E.2d at 177.  As the United States Supreme Court has noted, "[t]he requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application."  Miller, 357 U.S. at 313.

In reviewing the trial judge's denial of Park's motion to suppress, we view the evidence in the light most favorable to the prevailing party, granting to it all reasonable inferences fairly deducible therefrom.  See Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).  We consider de novo, however, whether the facts in evidence establish that the officers unlawfully infringed upon Park's Fourth Amendment right to be free from unreasonable searches and seizures.  See McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc).

Although evidence proved Longerbeam knocked and waited a reasonable time for Park to answer the door, she did not identify herself as a police officer.  She appeared at his door

wearing casual clothes and displaying no indication of her status.  She also did not indicate the reason for her presence.  Instead, she said something like, "I'm sorry," which suggested she knocked in error.  Within a matter of seconds, however, the tactical team rushed the door, which Longerbeam was holding ajar with her umbrella, and announced as they entered that they were the police and had a search warrant.

The evidence proved that each member of the tactical team wore a black, one-piece "flight suit type" of outfit and a black hood.  The evidence also proved that the outfit had a patch on the sleeves, but not what the patch indicated.  Although the evidence proved that the word "police" was displayed on the tactical team's outfit, S.M. Monahan, one of the other detectives, testified that the tactical team wore armored vests over the upper part of their outfits.  No evidence indicated that the vests contained identifying letters.  Even if the trial judge disbelieved Park's testimony that he did not see any police markings and a witness' testimony that she did not see the word "police" on the outfits, the evidence clearly proved that neither Longerbeam nor the tactical team verbally identified themselves as the police before they forcibly entered Park's home.

The tactical team's rushed entry, while simultaneously announcing that they had a search warrant, is particularly troubling.  "[E]ntering simultaneously with . . . announcing

. . . affords the occupant no reasonable opportunity to respond before his home is forcibly entered."  Hargrave, 21 Va. App. at 324, 464 S.E.2d at 178; see also Wynne, 15 Va. App. at 767, 427 S.E.2d at 231 (holding that five seconds is not long enough to give occupants time to respond to the knock and allow peaceable entry).  As the Supreme Court noted in Miller, "[t]he burden of making an express announcement [before a forced entry] is certainly slight.  A few more words by [the detective] would have satisfied the requirement in this case."  257 U.S. at 309-10.  Simply put, absent exigent circumstances, the entry was unlawful.  See Hargrave, 21 Va. App. at 327, 464 S.E.2d at 179.

The Commonwealth argues, however, that the officers acted reasonably under exigent circumstances.  We are mindful that "[t]he validity of a search pursuant to the execution of a valid search warrant is 'judged in terms of its reasonableness within the meaning of the . . . United States Constitution and . . . the Constitution of Virginia.'"  Wynne, 15 Va. App. at 766, 427 S.E.2d at 230 (citation omitted).  Although the Commonwealth does not argue that the police feared for their safety, the Commonwealth contends Longerbeam thought Park saw the tactical team behind her and knew they were the police, thus creating exigent circumstances which justified the method by which the police entered.  Longerbeam did not signal the tactical team to advance, however, and no member of the tactical team testified.

Thus, no evidence established why the tactical team rushed the door.

"Exceptions to the [knock and announce] rule . . . permit officers to make an unannounced entry where they have [reasonable suspicion] to believe that their peril would be increased if they announced their presence or that an unannounced entry is necessary to prevent persons within from escaping or destroying evidence."  Heaton, 215 Va. at 138, 207 S.E.2d at 830; see also Wilson v. Arkansas, 514 U.S. 927, 936 (1995).  Based on Longerbeam's testimony that she thought Park had seen the tactical team because his eyes "brightened up," the trial judge found it was reasonable for the police to believe Park saw them.  Even if Park saw the tactical team, however, the record permits only speculation that he knew they were police officers.  "A vague notion that perhaps [Park] had recognized [the men in black to be] . . . officer[s], standing alone, is not enough" to justify the entry.  State v. Ellis, 584 P.2d 428, 431 (Wash. 1978).  The evidence of what Park may have seen suggests his conduct was appropriate.  Standing at Park's door was a woman, whom he apparently did not know, indicating, by saying, "I'm sorry," that she may have knocked at the wrong door.  Off to her side were persons dressed in black outfits with masks, whom he may or may not have seen.  It was nighttime in December.

Given the circumstances then existing, any reasonable person would have feared from the black clad intruders "seeming aggression," Johnson, 213 Va. at 104, 189 S.E.2d at 679, or "violence and volatile confrontation." Hargrave, 21 Va. App. at 323, 464 S.E.2d at 177. Park testified that after he attempted to close the door, between eight and ten men in black outfits, wearing black hoods rushed into his home while he was still near the door. They forced him to the floor, telling him in so many words, "get down on the f'ing ground before such and such happens." The Commonwealth did not dispute that, although Park was not far from the door, the tactical team did not announce their presence and give him an opportunity to open the door before they burst into his home. Nor did the Commonwealth dispute that Longerbeam never identified herself as a police officer. "Immediate forceful entry is particularly offensive, and indeed dangerous, when the only reasonably visible officers are in plain clothes." Ellis, 584 P.2d at 431.

The police wore clothes which did not plainly announce their identity as law enforcement officers. Longerbeam came to Park's door in plain clothes. The tactical team wore hoods over their heads and faces and vests over their outfits. Cf. Lewis v. Commonwealth, 26 Va. App. 113, 116, 493 S.E.2d 397, 398-99 (1997) (noting that the word "police" was emblazoned on the officers' uniforms, they wore police badges on their outer clothing, and they announced their identity as police officers

five to ten times).  Although a witness for the Commonwealth testified that the officers were wearing a patch on their sleeves, no evidence established that the patch actually identified them as the police or was so prominent that identification was clearly conveyed.  The fact that Park tried to close the door after looking over Longerbeam's shoulder "did not of itself prove that he knew [her] purpose [was to conduct a search of his home]."  Miller, 357 U.S. at 311.  Park's conduct "was an ambiguous act . . . [and] could have been merely the expected reaction of any citizen having this experience . . . , particularly since it [was not apparent] that the officers were in uniform."  Id.

From the evidence in this record, "[t]he most that can be said is that [Park's] act in attempting to close the door might be the basis for the officers being virtually certain that [he] knew there were police at his door."  Id. (emphasis added).  As the Supreme Court noted, however, this "falls short of a virtual certainty that [Park] knew of their purpose [of executing a search warrant]."  Id. at 312-13.  Therefore, even if Park realized Longerbeam was a police officer, the warrant was still unreasonably executed because Longerbeam and the tactical team failed to announce their purpose before entering.

The Commonwealth further argues that an immediate entry was necessary because it is common practice for drug dealers to use barricades and lookouts and to store drugs near the kitchen sink

or bathroom to allow for quick disposal.  The trial judge found that Park's action of attempting to close the door on Longerbeam warranted a concern on the part of the officers that Park "was taking action to frustrate their attempt to gather evidence."  A general practice among drug dealers, however, is not sufficient to justify a "no-knock entry" in this case.  See Heaton, 215 Va. at 138-39, 207 S.E.2d at 831 (noting that the relevant factor is what the officers knew), 215 Va. at 139, 207 S.E.2d at 831; see also Gould v. Davis, 165 F.3d 265 (4th Cir. 1999) (recognizing that the exigent circumstances that justify failure to knock and announce must be specific to the individual and premises at issue).  In reversing a conviction based on the fruits of a similar "no-knock" entry, the Supreme Court found the following:

> The police did not know where in Heaton's apartment the drugs would be found.  They were not familiar with the interior arrangement of the apartment.  They saw no drugs in the possession of any of the occupants as they were seated in the living room.  They saw no firearms and had no reason to believe that any would be used by the occupants to the greater peril of the officers if they announced their presence.  They had no reason to believe that the occupants were destroying or planning to destroy evidence or that they could have destroyed evidence if the officers had demanded entry before breaking down the door.

Heaton, 215 Va. at 139, 207 S.E.2d at 831.

Moreover, we have held that "where the only exigent circumstance is that the object of the search is drugs, which by

their nature are readily disposable, officers may not, without more, dispense with the need to wait a reasonable time for the occupants to respond before making a forced entry."  Hargrave, 21 Va. App. at 325, 464 S.E.2d at 179 (citation omitted); see also Richards v. Wisconsin, 520 U.S. 385, 396 (1997) (holding that no "felony drug investigations" exception exists to the Fourth Amendment requirement to first knock and announce and then allow time for peaceable compliance before executing a search warrant).  "[A] search is not to be made legal by what it turns up.  In law it is good or bad when it starts and does not change character by its success."  United States v. Di Re, 332 U.S. 581, 595 (1948)).  No evidence in this record proved the officers had reason to believe the occupants were destroying or planning to destroy evidence.

"[A] lawful entry is the indispensable predicate of a reasonable search."  Ker v. California, 374 U.S. 23, 53 (1963). This entry was unlawful because no exigent circumstances existed, and the police neither announced their presence before entry nor allowed Park the opportunity to admit them peaceably. We have held to be unreasonable even a single officer peaceably opening an unlocked closed front door after knocking and yelling, "Police, search warrant," and waiting two to three seconds before entering.  See Hargrave, 21 Va. App. at 324, 464 S.E.2d at 178.  Likewise, yelling, "police, search warrant," waiting twenty seconds, and then rushing in is unreasonable.

See Gladden, 11 Va. App. at 597, 400 S.E.2d at 792. Entering Park's residence, the police failed to meet the standards for the reasonable execution of a search warrant and, thus, violated the "constitutional protections against unreasonable searches and seizures guaranteed by the Fourth Amendment of the United States Constitution and Article I, § 10 of the Virginia Constitution." Hargrave, 21 Va. App. at 322, 464 S.E.2d at 177. Because a lawful entry "was not done in this case, . . . any evidence seized as a result of this entry was 'the fruit of the poisonous tree' and should have been suppressed." Gladden, 11 Va. App. at 600, 400 S.E.2d at 794 (citation omitted).

### III.

Park also contends that his due process right to a fair trial was abridged when, upon the Commonwealth's motion, a circuit court judge held an ex parte hearing that resulted in the destruction of evidence. Park argues that Steele, the person with whom the police had engaged in undercover drug transactions, was the only one involved in selling drugs. Park also argues that the marked "buy money" from Steele's sales to the police was included in the funds which were seized. Thus, Park contends the money was exculpatory evidence essential to his defense because he could have shown that his fingerprints were not on the money.

The evidence proved that the affidavit in support of the search warrant authorized the police to seize as evidence any

money found in the residence.  The officers seized $3,662 during the search and filed a sworn return verifying that the seized money was evidence.

Although Park's counsel had filed an appearance of counsel form with the clerk of the court on December 18, 1997, and the preliminary hearing had been scheduled, the Commonwealth sought and obtained an ex parte hearing with a circuit court judge concerning the money seized during the search.  During the hearing, the judge entered an order authorizing the police to remove the seized money from the property room, where it was maintained as evidence in accordance with Code § 19.2-58, and to deliver it to the United States Drug Enforcement Agency for federal forfeiture proceedings.  The order was never served on Park or his counsel.  Acting under authority of the order, the police deposited the money into a bank in exchange for a cashier's check.

During the regular course of trial preparation, Park's counsel filed a motion for discovery to inspect the seized items.  After the trial judge ordered discovery, Park learned of the ex parte proceeding.  Park contends that had he been given notice of the proceedings, he would have argued that the currency was exculpatory and essential to his defense and that the federal government had not requested the turnover.

The ex parte nature of the proceedings is especially troublesome.  Upon the prosecutor's application and without

notice to Park, the trial judge authorized the police to deliver the seized currency to the Drug Enforcement Agency for forfeiture proceedings. The evidence suggests that the Commonwealth first informed the federal agency of the money the day after the ex parte meeting. Before Park had an opportunity to explain his need for the evidence and without waiting for a response from the federal agency, the Commonwealth converted the cash into a cashier's check.

It is undisputed that Park's fingerprints were not on the drugs found at the home and that Park was not involved in any of the controlled buys which formed the basis for the search warrant. Park contends the Commonwealth's conduct forever deprived him of the opportunity to have fingerprint analysis conducted on the cash. The Commonwealth argues, however, that even assuming the money did not contain his fingerprints, this fact would not exonerate Park because Park admitted he was selling cocaine and told the police where to find the cocaine in the apartment.

In the seminal case involving the government's destruction of evidence, the United States Supreme Court held that the government violates due process if the evidence possessed "exculpatory value that was apparent before the evidence was destroyed, and [the evidence is] of such a nature that the defendant would be unable to obtain comparable evidence by any other reasonable means." California v. Trombetta, 467 U.S. 479,

489 (1984).  Later, the Court added the requirement that the

defendant demonstrate bad faith.

> The Due Process Clause of the Fourteenth
> Amendment, as interpreted in Brady [v.
> Maryland, 373 U.S. 83 (1963)], makes the
> good or bad faith of the State irrelevant
> when the State fails to disclose to the
> defendant material exculpatory evidence.
> But we think the Due Process Clause requires
> a different result when we deal with the
> failure of the State to preserve evidentiary
> material of which no more can be said than
> that it could have been subjected to tests,
> the results of which might have exonerated
> the defendant.  Part of the reason for the
> difference in treatment is found in the
> observation made by the Court in [California
> v. Trombetta, 467 U.S. 479, 486 (1984)],
> that "[w]henever potentially exculpatory
> evidence is permanently lost, courts face
> the treacherous task of divining the import
> of materials whose contents are unknown and,
> very often, disputed."  Part of it stems
> from our unwillingness to read the
> "fundamental fairness" requirement of the
> Due Process Clause, see Lisenba v.
> California, 314 U.S. 219, 236 (1941), as
> imposing on the police an undifferentiated
> and absolute duty to retain and to preserve
> all material that might be of conceivable
> evidentiary significance in a particular
> prosecution.  We think that requiring a
> defendant to show bad faith on the part of
> the police both limits the extent of the
> police's obligation to preserve evidence to
> reasonable bounds and confines it to that
> class of cases where the interests of
> justice most clearly require it, i.e., those
> cases in which the police themselves by
> their conduct indicate that the evidence
> could form a basis for exonerating the
> defendant.  We therefore hold that unless a
> criminal defendant can show bad faith on the
> part of the police, failure to preserve

> potentially useful evidence does not
> constitute a denial of due process of law.

Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988).

Thus, the test for determining whether Park's due process rights were violated is whether the Commonwealth acted in bad faith. When the government in bad faith destroys evidence "potentially" useful to the defense, it denies the defendant due process of law. Galbraith v. Commonwealth, 18 Va. App. 734, 739, 446 S.E.2d 633, 636 (1994). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Youngblood, 488 U.S. at 57 n.*.

The Commonwealth has not given a valid reason for the ex parte proceeding leading to the destruction of the evidence. According to established procedure, opposing counsel must be given notice before the entry of an order in the circuit court. See Rule 1:13. The rules contain no exception for orders delivering seized evidence to the United States for forfeiture proceedings. The impropriety of that procedure, however, does not solely determine the issue to be resolved, viz., "the police's knowledge of the exculpatory value of the evidence." Youngblood, 488 U.S. at 57 n.*. A police officer testified that he requested a prosecutor, who had no involvement in Park's case, to seek the order. The trial judge made no findings

regarding the knowledge of the Commonwealth's agents. Accordingly, because of the unresolved facts in the record, we do not decide this question.

We hold that the Commonwealth failed to justify the forceable entry to Park's home.  Because the trial judge erred in not suppressing the seized evidence, we reverse the judgment of conviction and remand the case for further proceedings, if the Commonwealth be so advised.  If further proceedings occur, the trial judge is directed to reconsider, pursuant to the Youngblood standard, the destruction of the evidence.

Reversed and remanded.