COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, McClanahan and Senior Judge Bumgardner
Argued at Richmond, Virginia


GREGORY L. GAGELONIA, A/K/A
  JEROME WHITE
                                                                OPINION BY
v.       Record No. 2343-06-2                  JUDGE ROBERT J. HUMPHREYS
                                                                JUNE 3, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
James E. Kulp, Judge Designate

Anthony G. Spencer for appellant.

Richard B. Smith, Special Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Gregory Gagelonia, a/k/a Jerome White ("White"), appeals his convictions of possession

with intent to distribute more than five pounds of marijuana, transporting controlled substances

into the Commonwealth, and possession of a firearm while in possession of a controlled

substance with the intent to distribute, in violation of Code §§ 18.2-248.1, 18.2-248.01, and

18.2-308.4, respectively.  White argues that the Commonwealth withheld exculpatory evidence,

in violation of Brady v. Maryland, 373 U.S. 83 (1963), and asks us to reverse his convictions and

order a new trial.  For the reasons that follow, we affirm his convictions.

BACKGROUND

A.  "The Delivery"

In mid-July of 2005, United States Postal Inspector Evelyn Cross ("Cross") received

information that a suspicious package had arrived in Richmond's airmail facility from Peoria,

Arizona.  The package listed the sender's name as "Karen Russell," and the recipient's name and

address as "Simone Russell, 2807 Hartman Street," an address in Henrico County. Cross went to

the facility and took possession of the package, which weighed 23 pounds, 4.4 ounces, and had

an expected delivery date of July 16, 2005. Recognizing the characteristics of illegal drug

packaging, Cross contacted a Henrico County canine unit to further inspect the package. Based

on the canine unit's results, Cross obtained a federal search warrant for the package. When

Cross opened the package, she found a ball of green leafy material wrapped in hardened

Styrofoam and cellophane. She again contacted the Henrico police and, together, they made

arrangements to conduct a "controlled delivery" of the material, which they repackaged using a

similar box and the original packing labels. Henrico police also obtained a search warrant for

2807 Hartman Street, the intended destination of the package.

On July 16, 2005, Henrico Police Investigator Shawn Diasperra ("Diasperra") of the

Technical Support Unit arrived in the area of 2807 Hartman Street at 7:00 a.m. and began video

surveillance of the home. Investigator Paul Ronson ("Ronson"), the lead investigator in the case,

arrived slightly prior to 8:00 a.m., but did not begin directly watching the house until

approximately 10:00 a.m.

At some point in the morning, Diasperra observed a postal carrier drive by 2807 Hartman

Street without stopping. White, who had previously been sitting on the stoop of the house, got

into a gray Pontiac and began driving in the same direction as the postal vehicle. After White

had been gone "three or four minutes," he returned to the house. The mail carrier verified that a

man had approached him and asked if he had a package for 2807 Hartman Street, but was unable

to identify the man.[1] Approximately twenty to thirty minutes after White returned, Cross drove

past the house in another mail truck without stopping. Cross noticed White sitting on the stoop,

---

[1] At trial, the mail carrier testified that he did not see the man who had approached him on his route in the courtroom.

and opined that White's behavior was consistent with "a person expecting a package." Cross continued down the street, turned around, parked the vehicle, retrieved the package, and approached White. White remarked that Cross was not "the regular carrier," and Cross informed White that the package was addressed to "Ms. Russell." White nodded, and signed the delivery receipt as "J. Russell." Cross then returned to her vehicle and returned to the post office. White entered the house with the package a few minutes later.

Ronson and the "entry team" entered the house at 11:19 a.m. and executed the search warrant. The entry team found the package unopened in the front room of the house and secured White, who denied any knowledge of the contents of the package. Also present in the house were Canice Butcher ("Butcher") and her four-year-old child.

White initially identified himself as Gregory Gagelonia ("Gagelonia") and said he was a resident of the house, but was unable to provide supporting identification. He then said that he was at the house waiting for someone named "Todd," and was helping with the mail, "because the female that was at the house was pregnant at the time." White also said that he had been living on Dove Street in Richmond until he had been shot there, and had since moved to a residential hotel. A search of White revealed $859 in cash, a cell phone, and a small Bible containing an address in Texas. A subsequent search of White's car revealed a .357 revolver, medical documents, and mailing receipts, all bearing Gagelonia's name. White acknowledged ownership of the gun.

Todd Bradley ("Bradley") lived at 2807 Hartman Street with Butcher, his girlfriend, at the time of the delivery. There was no resident of the house named "Russell." White, whom Bradley knew as "Tony," had asked Bradley if he could use his address to receive packages. Bradley agreed, and White had received at least three packages at Bradley's address during the previous one to two months, but Bradley had not known what was in the packages. White had

- 3 -

called Bradley the morning of the delivery and informed him that a package would be arriving that day, but did not tell him what was in that package. Bradley had purchased marijuana from White in the past, which they had smoked together.

Ronson and his team contacted Bradley after they executed the search warrant at his house and told him to come home. When he arrived, Bradley denied knowledge of the contents of the package and told police he only knew that defendant was expecting a package.

Bradley told Ronson that he had seen White at a hotel in Chesterfield County about two weeks before the delivery, and brought Ronson to this hotel. Ronson went to Room 314 of the Inn Town Suites in Chesterfield County later that afternoon based on what he had learned from Bradley. There, he encountered Debbie Fletcher ("Fletcher"), the renter of the Pontiac, and Fletcher and the defendant's child. After speaking with Fletcher, Ronson searched the hotel room, in which he found $1,000 in cash, numerous shipping documents, and "O sheets," or an accounting ledger used to represent the inflow-outflow of drugs and money. Police also found a digital scale in the room that contained marijuana residue. White admitted that he had purchased the scale because he thought it was a "good deal." White also admitted to Ronson that he had been staying in Room 314 of the Inn Town Suites, but made no statements regarding the documents found in the room.

Postal Inspector Cross later assembled a postal tracking history for 2807 Hartman Street, and discovered that five packages from Texas had been delivered to that address in May-June 2005. The packages weighed 11 pounds 3 ounces, 1 pound 8 ounces, 9 pounds 14 ounces, 35 pounds 7 ounces, and 15 pounds 13 ounces, respectively.

An analysis at the Department of Forensic Science revealed that the "green leafy" substance delivered in the package on July 16, 2005 was 190.97 ounces of marijuana. The gun found in the Pontiac was in working condition.

- 4 -

B.  Preliminary Hearing

The General District Court of Henrico County ("GDC") held a preliminary hearing on December 7, 2005 styled Commonwealth of Virginia v. Gregory Leonard Gagelonia.  Ronson was the only witness, and over White's objections, was allowed to testify to a number of facts that were not within his personal knowledge.[2]  Among other things, Ronson testified that White had gotten into his car during the surveillance, drove after the mail carrier's truck, and had a conversation with the mail carrier.  The GDC certified charges for possession with intent to distribute, transporting a controlled substance into the Commonwealth, and possessing a firearm while attempting to distribute marijuana.

C.  Trial

On January 9, 2006, a grand jury returned indictments based on the charges certified by the GDC.  On April 11, 2006, White appeared for a bench trial in the Circuit Court of Henrico County ("trial court").

In addition to presenting the evidence outlined above, the Commonwealth also asked the court to qualify Ronson as an expert in illegal drug distribution, which it did.  Ronson then opined that the Styrofoam and cellophane materials surrounding the marijuana in the box were intended to disguise the scent of the marijuana during shipping.  Ronson also testified that in his opinion, the amount of marijuana in the box was inconsistent with personal use and would have a street value of over $61,000.

---

[2] The general district court judge overruled White's hearsay objections, stating that it would allow the evidence "only for probable cause purposes."  In passing, we note the plain language of Code § 19.2-183(B) ("At the [preliminary] hearing the judge shall, in the presence of the accused, hear testimony presented for and against the accused *in accordance with the rules of evidence applicable to criminal trials in this Commonwealth*." (emphasis added)), and we are unaware of any "probable cause" exception to the rule barring the admissibility of hearsay evidence.

Bradley also testified as a witness against White, and acknowledged that he had been charged with conspiracy to distribute marijuana as a result of the delivery on July 16, but stated that the Commonwealth had not made him any promises of leniency. During cross-examination, White's counsel asked him if he expected to get any favorable treatment with his charge as a result of his testimony. Bradley responded: "Well, I leave that to my attorney to advise me. I hope for a fair trial, and my attorney is going to do the rest."[3]

White then took the stand on his own behalf and testified that his real name is Jerome Leslie White, but he had given the police the name of an old friend, "Greg Gagelonia," because he had once been fingerprinted while using that alias. He admitted that he used to live in Texas, but denied knowing anyone in Peoria, Arizona. White also testified that when Cross had delivered the package, he had "signed what she told me to sign. She said Russell, so I signed Russell." He said he then went inside to tell Butcher about the box, and after she told him that no one named Russell lived there, he had intended to give the box back to the mail carrier, but the police came in before he could act. White also denied having admitted that the firearm was his.

In finding White guilty as charged, the trial court found, *inter alia*:

> The Court accepts the testimony of the Commonwealth's witnesses, and the Court rejects the testimony of the defendant.

> The evidence in the Court's view is clear. The defendant is using a fake address or an address where he doesn't live to get marijuana.

> The Court accepts the testimony of Mr. Bradley, that the defendant called him on the morning of July the 16th and said, I'm

---

[3] Bradley's case had been continued three times in GDC, and on one of those occasions, the continuance had been granted by joint motion of the defense and Commonwealth. The GDC granted two of these continuances upon motions made immediately after White's case had been continued. On April 12, 2006, the day after White's trial, the Commonwealth moved to *nolle prosequi* Bradley's case in the GDC. Bradley's case had been pending for almost ten months.

expecting a package. All of his actions seem to indicate that is precisely what he is doing. . . .

. . . [T]he Court did not hear Ms. Cross say to the defendant, I want you to sign this in the name of Ms. Russell. She simply said the package was for Ms. Russell. The defendant takes it upon himself to sign somebody's name that he doesn't know whether they live there or not. . . .

I think that this is an indication that the defendant knew precisely what was in the package. He knew that it was marijuana.

\*      \*      \*      \*      \*      \*      \*

. . . [D]rugs are a commodity of significant value, unlikely to be abandoned or callously left in an area. So the reasonable inference is the defendant has had packages delivered to him before. . . .

The Court believes the evidence [to which] Mr. Bradley testified, and the Court accepts the testimony, that he, the defendant had done this on several occasions in the past. . . .

\*      \*      \*      \*      \*      \*      \*

As to the indictment on transportation . . . [case law holds that] receiving a package in the mail [is] sufficient for a conviction. . . . There was sufficient evidence to find that the defendant participated as a principal in the second degree in transporting the drugs into the Commonwealth with the intent to distribute.

The evidence is that this . . . box originated in Arizona, came through the mail, and was to be delivered in Virginia. And the Court finds that is sufficient to show that the defendant was the one who was to receipt for the package [sic], he knew it was coming, that makes him a principal in the second degree.

The Court accepts the testimony of Investigator Ronson when he says that he advised the defendant that there was a firearm in the car, that the defendant admitted that it was his. Now the defendant says, it wasn't mine, I never said that. The Court does not accept that testimony.

On May 31, 2006, prior to sentencing, the circuit court entered an order granting the defendant's motion to substitute counsel. Through his new attorney, White filed a motion for the court to order the Commonwealth to produce the "videotaped surveillance in its entirety and the cell phone seized from the defendant for *in camera* inspection by the Court to determine whether the Commonwealth is in violation of <u>Brady v. Maryland</u>[, 373 U.S. 83 (1963),] and its progeny."

White filed a second motion on July 25, 2006, this time moving the court to vacate its judgment of guilt and order a new trial, appoint a special prosecutor on the grounds that the Commonwealth had withheld exculpatory evidence, and order the Henrico police to reveal all of its evidence files in White's case. The motion referred to four categories of evidence that, if known, would resolve any questions of whether the Commonwealth had withheld exculpatory evidence in White's case. First, White argued that his and Bradley's cell phones, if produced, might show that White had not in fact called Bradley on the morning of the delivery, and would thus be exculpatory. White next noted that the five-hour videotape of the house before Inspector Cross made the delivery, if produced, might have shown that White in fact did not drive away from 2807 Hartman Street in pursuit of the mail carrier, and would thus be exculpatory. Additionally, he argued that the fact that the videotape and cell phones were missing was exculpatory in and of itself, because he would have been entitled to a favorable missing evidence inference at trial had he known about the missing evidence. Further, White referenced numerous inconsistencies between Ronson's testimony at the preliminary hearing and at trial, as well as alleged falsehoods in his testimony, including his testimony at the preliminary hearing that he had seen White have a conversation with the mail carrier, when in fact he had not seen this happen. Finally, White speculated that Bradley had lied at trial about not expecting leniency in

exchange for his testimony and the Commonwealth should have notified him of the supposed agreement between Bradley and the Commonwealth.

The trial court heard evidence and arguments on White's post-trial motion on July 27, 2006. At this hearing, Ronson testified that he had not placed White's cell phone in evidence files, but had placed it in White's personal property at the jail, and had written down the numbers he had seen on the telephone, which included White's and Bradley's. However, White introduced a certificate of analysis at the hearing indicating that Ronson had, in fact, submitted White's cell phone to the Department of Forensic Science for testing on August 8, 2005, and that Ronson had received a certificate of analysis from the Department on October 31, 2005.[4] Also during this hearing, the Commonwealth's attorney acknowledged that there had been a tape of the first five hours of surveillance before the controlled delivery in addition to the five-minute tape showing the delivery itself, but that it had been misplaced and could not be located, a fact he had not realized until a few days earlier. At the conclusion of the hearing, the trial court continued the case until August 17, 2006, and directed the Commonwealth's attorney and investigating officer to meet with White's counsel in the meantime and show him certain physical evidence.

The parties returned to court on August 17, 2006 for argument and ruling on the Brady motions, as well as for White's sentencing. No additional evidence was submitted. The trial court denied White's motion to set aside the conviction, stating:

> [T]he Court finds that the fact that . . . Ronson made several misstatements at the preliminary hearing, and these misstatements were not disclosed to [White]'s counsel, do not give rise to a Brady violation requiring a new trial.

---

[4] In fact, the Sheriff's deputy at the Henrico County jail property room verified that White's cell phone had never been placed into White's personal property at the jail.

Most of the alleged misstatements, in the Court's view, were mainly interpretations of evidence drawn by Detective Ronson. For example, Detective Ronson's testimony that the defendant had a conversation with the postal carrier is a reasonable inference from the evidence. The testimony at trial was that when the postal carrier went by, the defendant got into an automobile and went in the direction of the postal carrier.

The postal carrier testified at trial that he had a conversation with someone about a package for the address where the defendant was on the porch, and that the defendant then returned to the porch shortly after he had gone in the direction of the postal carrier. The reasonable inference, in the Court's view, is that it was the defendant who spoke to the postal carrier.

The Court is of the opinion that at trial when the postal carrier said . . . he didn't see [White] in the courtroom, even though [he] was in the courtroom, . . . the postal carrier was simply mistaken. . . .

\* \* \* \* \* \* \*

There were a number of incidents where Detective Ronson used a plural term when describing items of evidence when only one item existed. And again, the Court finds that these are not intentional falsehoods but merely misstatements.

\* \* \* \* \* \* \*

The Court finds that even if all of these misstatements by Detective Ronson had been brought out at trial, they would not have been sufficient to undermine the confidence in the outcome of the proceeding. . . .

\* \* \* \* \* \* \*

In the Court's opinion, the testimony about the missing tape, . . . does not require the Court to grant a new trial to the defendant.

White subsequently filed a motion asking the trial court to reconsider its ruling, which it denied. We then awarded White this appeal.[5]

---

[5] On September 13, 2006, White filed a motion asking the trial court to reconsider its denial of the motion that is the subject of the instant appeal. On November 8 and 9, 2006, after

- 10 -

White argues on appeal, as he did in the trial court, that he should receive a new trial because the Commonwealth withheld exculpatory evidence in his case, in violation of Brady and its progeny. We disagree.

When an exculpatory evidence claim is reviewed "[o]n appeal, the burden is on appellant to show that the trial court erred." Galbraith v. Commonwealth, 18 Va. App. 734, 739, 446 S.E.2d 633, 637 (1994).

In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material to either guilt or to punishment[.]" 373 U.S. at 87. Non-disclosure of evidence to the defense violates the Brady rule when the evidence is "(1) either directly exculpatory or [has] impeachment value, (2) suppressed by the government, and (3) material." Lockhart v. Commonwealth, 34 Va. App. 329, 345, 542 S.E.2d 1, 8 (2001). "Stated differently, 'the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

---

the 21-day period from August 18, 2006 had expired, White filed new motions to set aside the judgments, requesting a new trial and for the trial court to recuse itself. In these motions, White alleged the existence of additional, newly discovered exculpatory evidence in his case, including the fact that Fletcher had also faced charges in Chesterfield County that the Commonwealth had *nolle prosequied* in exchange for her testimony against White, and the results of a pending internal affairs investigation against Ronson. The trial court heard oral argument on these motions and denied them. This Court dismissed White's petition for appeal on these motions under Rule 1:1, because more than twenty-one days had passed since the entry of the final order in the case, and the trial court accordingly lacked jurisdiction. See Jerome White, a/k/a Gregory L. Gagelonia v. Commonwealth, Record No. 2916-06-2 (Va. Ct. App. June 29, 2007). Although White mentions these events in his brief on the instant appeal, this Court specifically stated that in granting White's petition for appeal it had not "considered (i) appellant's motion to reconsider filed on September 13, 2006 . . . or (ii) appellant's motions filed on November 8 and 9, 2006[.]" See Gregory L. Gagelonia, a/k/a Jerome White, Record No. 2343-06-2 (June 29, 2007 order granting petition for appeal in part).

verdict worthy of confidence.'" Workman v. Commonwealth, 272 Va. 633, 645, 636 S.E.2d 368, 374 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

"[I]f a Brady violation is established, [an appellate court] do[es] not engage in a harmless error review. Instead, a 'constitutional error occurs, and the conviction must be reversed . . . if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.'" Teleguz v. Commonwealth, 273 Va. 458, 488, 643 S.E.2d 708, 727 (2007) (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)) (citations omitted). Exculpatory "information known to the police is information within the Commonwealth's knowledge and the prosecutor is obliged to disclose regardless of the state of his actual knowledge." Moreno v. Commonwealth, 10 Va. App. 408, 418, 392 S.E.2d 836, 842-43 (1990). However, no Brady violation occurs "'if the evidence in question is available to the defendant from . . . sources [other than the Commonwealth].'" United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) (quoting United States v. Davis, 787 F.2d 1501, 1505 (11th Cir. 1986)).

White asserts that four specific areas of exculpatory evidence exist. These are (1) the disappearance of White and Bradley's cell phones from Ronson's custody; (2) the disappearance of the five-hour surveillance tape; (3) the true reason that Bradley's preliminary hearing was continued and his charges eventually *nolle prosequied*, and what benefit Bradley expected in exchange for his testimony; and (4) Ronson's numerous instances of false testimony.[6] Because

---

[6] The Commonwealth initially contends that White's entire argument is procedurally defaulted because White did not raise these issues at trial. Yet, White alleged that the Commonwealth had withheld or failed to preserve exculpatory evidence preceding his trial and, accordingly, requested that the court order a new trial. Because we are satisfied that White took the necessary steps to "afford the trial court an opportunity to rule intelligently on the issues presented," Weidman v. Babcock, 241 Va. 40, 44, 400 S.E.2d 164, 167 (1991), we hold that White adequately preserved this issue for appeal.

the exculpatory value of the missing videotape and cell phones is similarly speculative, we address those issues together.

### A.  The Videotape and Cell Phones

White first argues that the missing videotape and cell phones merit reversal of his convictions and a new trial under Brady because the Commonwealth did not notify him of the fact that they were missing prior to trial.  While White characterizes this as a Brady violation, this allegation is actually controlled by the holdings of the Supreme Court of the United States in California v. Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 488 U.S. 51 (1988).  White also argues that this evidence would be exculpatory under Brady because of a missing evidence inference favorable to him, also known as "spoliation."

### 1.  Trombetta and Youngblood

Brady and its progeny pertain to exculpatory evidence still in the government's possession, of which the exculpatory value is known.  United States v. Femia, 9 F.3d 990, 993 (1st Cir. 1990).  In contrast, and as is the case here, Trombetta and Youngblood pertain to evidence that is no longer in the government's possession, whose exculpatory value, if any, is unknown.  Id.

In Trombetta, the seminal case involving the prosecution's failure to preserve evidence, the United States Supreme Court held that "the government violates due process if the evidence possessed 'exculpatory value that was apparent before the evidence was destroyed, and the evidence is of such a nature that the defendant would be unable to obtain comparable evidence by any other reasonable means.'"  Park v. Commonwealth, 32 Va. App. 407, 420, 528 S.E.2d 172, 178 (2000) (quoting Trombetta, 467 U.S. at 489).  In Youngblood, the Court added a third requirement, holding that if "a criminal defendant can[not] show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process

- 13 -

of law." 488 U.S. at 58. Thus, a defendant seeking a new trial on the basis of missing evidence formerly in the Commonwealth's possession must show that (1) the evidence possessed an apparent exculpatory value, (2) the defendant could not obtain comparable evidence from other sources, and (3) the Commonwealth, in failing to preserve the evidence, acted in bad faith. Furthermore, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at 56 n.*.

White has not met his burden in showing that either the police or the Commonwealth acted in bad faith in losing the tape and cell phone. Although Ronson testified incorrectly that he had placed White's cell phone in the personal property room of the county jail, this testimony came months after the fact, and the trial court apparently inferred that he was honestly mistaken rather than deliberately lying. Nothing in the record indicates that the police had knowledge that these pieces of evidence were exculpatory, nor has White proffered the nature of any exculpatory information either the videotape or the cell phone would show. Instead, White simply expresses the hope that they might either show that he did not call Bradley or did not drive off in pursuit of the mail carrier. Conversely, by all accounts, Ronson and Diasperra both thought that the videotape and cell phones would be *inculpatory*, as they both provided evidence from which the fact finder could infer that White was expecting a package to arrive in the mail. Thus, with regard to both the videotape and the cell phone, White has not shown that either piece of evidence "possessed exculpatory value" apparent prior to the misplacement of the evidence. Park, 32 Va. App. at 420, 528 S.E.2d at 178 (quoting Trombetta, 467 U.S. at 489) (internal quotations omitted).

Moreover, with regard to his cell phone, White could have certainly obtained comparable evidence from other sources. See Stockton v. Murray, 41 F.3d 920, 927 (4th Cir. 1994) ("Brady

- 14 -

does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense.").  Because "[t]his call also must have appeared in [White's] own phone records[,]" United States v. Leibowitz, 857 F.2d 373, 379 (7th Cir. 1998), White has not met his burden on this requirement either.

White also argues that the fact that the videotape and cell phones were missing is, in and of itself, a Brady violation, because had he known that the videotape and cell phones were missing at trial, he would have been entitled to an exculpatory missing evidence inference. Again, regarding the cell phones, "Brady does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense."  Stockton, 41 F.3d at 927.

Regarding the missing videotape, White relies on Wolfe v. Virginia Birth-Related Neurological Injury Comp. Program, 40 Va. App. 565, 580 S.E.2d 467 (2003), in which we discussed the concept of spoliation, or a missing evidence inference.  Specifically, we stated that "Virginia law recognizes a spoliation or missing evidence inference, which provides that 'where one party has within his control material evidence and does not offer it, there is an inference that the evidence, if it had been offered, would have been unfavorable to that party.'"  Id. at 580-81, 580 S.E.2d at 475 (quoting Charles E. Friend, The Law of Evidence in Virginia, § 10-17, at 338 (5th ed. 1999)).  "A spoliation inference may be applied in an existing action if, at the time the evidence was lost or destroyed, 'a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential *civil* action.'"  Id. at 581, 580 S.E.2d at 475 (quoting Boyd v. Travelers Ins. Co., 652 N.E.2d 267, 270-71 (Ill. 1995)) (emphasis added).

- 15 -

However, our Supreme Court has held that "spoliation" does not apply in criminal cases. In Russell v. Commonwealth, 216 Va. 833, 836-37, 223 S.E.2d 877, 879 (1976), the Court stated:

> We do not believe a missing-witness presumption instruction has any place in a criminal case. If its use is permitted, both the prosecution and the defense, against the risk of having the instruction granted at the request of the opposing party, would be required to call all witnesses possibly having some knowledge of the case, even though their testimony might be merely cumulative.

Thus, it is clear that White does not meet his burden of proving that this evidence was exculpatory merely by demonstrating its absence and, thus, the Commonwealth's failure to disclose this evidence did not constitute a Brady violation.

### B. Todd Bradley

As noted above, Bradley, the resident of the house to which Inspector Cross delivered the package, faced a conspiracy to distribute marijuana charge, and testified against White at his trial. He further testified that the Commonwealth had made him no promises of leniency in exchange for his testimony. He also testified that his preliminary hearing was not continued so that it would take place after White's trial, but because he was out of town. When White's attorney asked Bradley about whether he expected favorable treatment as a result of testifying, Bradley responded: "Well, I leave that to my attorney to advise me. I hope for a fair trial, and my attorney is going to do the rest."

White argues that "[t]he prosecutor in this case had a duty to disclose any false testimony by Todd Bradley as to how often and why his preliminary hearing was continued and whether he had any reason to hope that his testifying against the appellant would benefit his case." The Commonwealth agrees that such a duty exists, but argues that White produced no evidence to show that Bradley lied. White's counsel responded at oral argument that "we all know how

- 16 -

these things work" and suggested that Bradley simply must have had an undisclosed agreement with the Commonwealth. We agree with the Commonwealth that such unsupported speculation is insufficient to satisfy White's burden to establish the existence of either perjury by Bradley or an undisclosed agreement for leniency.

The record simply does not support White's claim that Bradley lied about his motivations for testifying. Bradley never denied that he was hoping for favorable treatment from the Commonwealth in exchange for his testimony, and nothing in the record contradicts Bradley's claim that his case was continued because he was out of town. Furthermore, White's attorney cross-examined Bradley about his pending charge at White's trial. Thus, the trial court sitting as the fact finder was aware that Bradley faced a criminal charge, and could infer that Bradley hoped for favorable treatment from the Commonwealth in exchange for his testimony. Therefore, even if we were to accept White's bare supposition that Bradley lied about his expectations from his testimony, we cannot say that the suppression of this evidence would "'undermine[] confidence in the outcome of the trial.'" Teleguz, 273 Va. at 488, 643 S.E.2d at 727 (quoting Bagley, 473 U.S. at 678). Thus, we reject White's argument in this regard as well.

### C. Ronson's Testimony

Lastly, White argues that Investigator Ronson's numerous "instances of false testimony" are exculpatory. However, White has not met his burden in showing that Ronson testified falsely.

"[C]onclusory allegations of perjury do not prove that [a witness'] testimony [is] false." United States v. Coronel-Quintana, 752 F.2d 1284, 1290 (8th Cir. 1985). Even "[c]ontradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." Tapia v. Tansy, 926 F.2d 1554, 1563 (10th Cir. 1991).

- 17 -

Although there clearly were inconsistencies in Ronson's testimony, the trial court found that many of these inconsistencies were due to his testimony at White's preliminary hearing, in which he testified to hearsay evidence not within his personal knowledge offered "only for probable cause purposes." Moreover, White's attorney at trial had a transcript of the preliminary hearing proceedings, and thus knew or should have known about any inconsistencies between Ronson's testimony at the preliminary hearing and trial. As such, they were not "suppressed by the government," Lockhart, 34 Va. App. at 345, 542 S.E.2d at 8, and, thus White fails to meet the requirements for a Brady violation in this area as well.

CONCLUSION

For the reasons stated herein, we hold that none of the evidence referenced by White meets the requirements of Brady, Trombetta, or Youngblood. Thus, we hold that the Commonwealth did not deprive White of due process either by withholding or failing to preserve exculpatory evidence. Accordingly, we affirm White's convictions.

Affirmed.