COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Malveaux and Senior Judge Annunziata
Argued at Fredericksburg, Virginia


UMESH KUMAR
                                          MEMORANDUM OPINION* BY
v.        Record No. 1636-15-4            JUDGE RICHARD Y. ATLEE, JR.
                                          SEPTEMBER 5, 2017
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge

Alison G. Powers, Assistant Public Defender, for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


A Fairfax County jury convicted Umesh Kumar of aggravated sexual battery.  On appeal,

he assigns four errors.  He asserts that the trial court erred when it (1) denied his "motion to

dismiss for failure to preserve exculpatory evidence"; (2) denied his motion to suppress his

statements, because such statements were obtained in violation of Miranda v. Arizona, 384 U.S.

436 (1966); (3) admitted certain exhibits, because the Commonwealth did not maintain a proper

chain of custody for such exhibits; and (4) denied his request for a jury instruction regarding an

inference related to the Commonwealth's destruction of evidence.  Finding no error, we affirm.

I. BACKGROUND

On appeal of a criminal conviction, "in conformity with familiar appellate principles, we

consider the facts in the light most favorable to the Commonwealth."  O'Dell v. Commonwealth,

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

234 Va. 672, 679, 364 S.E.2d 491, 495 (1988).[1]  What follows is a general procedural and factual summary of the case.  More specific facts relevant to individual assignments of error are included separately in the respective portions of this opinion.

A.  The Crime:  1994

On December 29, 1994, four-year-old J.C. was at the apartment of her babysitter, Champa Kumar (hereinafter "Champa" to avoid confusion).  Appellant Umesh Kumar (hereinafter "Kumar"), thirty-two years old at the time, was also in the apartment that day.  Kumar, a live-in relative of Champa, was home sick from work.  Champa went to the store to get groceries, leaving J.C. with Kumar.  At trial, twenty years later, J.C. testified to what happened next:

> [H]e pulled down my pants.  My underwear were still on.  And he began to—he put his penis in my vagina between the lips and thrusted for a little bit.  Then he did the same thing between my butt cheeks . . . .  Then that's when he finished, where I thought I had peed my pants and cleaned it up and then that was it.

J.C. testified that she believed she had wet herself because she "felt a liquid come out and then he stopped what he was doing."  She recalled that all of this occurred on a bed and that Kumar cleaned up the resulting wetness with a red towel.  While the attack was happening, J.C. "thought it was a game and I was upset that he stopped playing with me.  Because I thought . . . he didn't want to play with me anymore."  At the time, she "related it to like a horsey game."  That evening at home, J.C. told her mother about the "game" she had played.  Her mother, alarmed,

---

[1] The exception to this general rule comes in Part II.D., when we address Kumar's allegation that the trial court abused its discretion when it refused his proffered jury instructions, because "this Court 'view[s] the facts relevant to the determination of that issue in the light most favorable to [the defendant].'"  Miller v. Commonwealth, 64 Va. App. 527, 547, 769 S.E.2d 706, 716 (2015) (alterations in original) (quoting Commonwealth v. Cary, 271 Va. 87, 90-91, 623 S.E.2d 906, 907 (2006)).

called the police and later transported J.C. to the hospital for an examination by a Sexual Assault Nurse Examiner ("SANE").

## B. The Investigation: 1994-1995

The SANE, Suzanne Rotolo, a/k/a Sue Brown, examined J.C. in the early morning hours of December 30, 1994. J.C. was wearing the same underwear she had worn at the time of the crime, and had not bathed since then. Using a fluorescent light, Nurse Rotolo swabbed the areas of J.C.'s body that suggested the presence of bodily fluids. She drew a sample of J.C.'s blood and collected a sample of hair from J.C.'s head. She photographed J.C.'s naked body, and testified that she observed "some redness" on J.C.'s genitals. Immediately after completing the examination, Nurse Rotolo placed the samples she had collected, along with J.C.'s underwear, in a sealed Physical Evidence Recovery Kit ("PERK") and gave the PERK to Detective John Pritchyk of the Fairfax County Police Department.

Detective Pritchyk then obtained a warrant for Kumar's arrest for aggravated sexual battery, in violation of Code § 18.2-67.3. Detective Pritchyk maintained possession of the PERK, and after he obtained the warrant, he went to his office at the Massey Building and placed the PERK in a property room locker. Other detectives who worked in the building had access to this locker using a key.

Police arrested Kumar early on the morning of December 30, 1994. Following the arrest, Detective Pritchyk spoke with Kumar at the Criminal Investigations Bureau ("CIB"). Detective Pritchyk spoke with Kumar in English and advised him of his Miranda rights. Kumar told Detective Pritchyk he spoke both English and Hindi. Speaking exclusively in English to Detective Pritchyk for approximately twenty minutes, Kumar denied using drugs or alcohol and stated he had completed tenth grade in school in India. Kumar complained he was not feeling well. He told Detective Pritchyk he had been in the apartment the day before, and Champa's

friend had visited. Kumar denied any involvement with J.C. He offered to provide his blood, urine, and "anything else" to assist with the investigation. Detective Pritchyk photographed Kumar and called Nurse Rotolo to come to the CIB to take Kumar's blood.

When Nurse Rotolo arrived, Detective Pritchyk introduced her to Kumar and provided her with a room for collecting the blood sample. Detective Pritchyk stood outside the door to the room while Nurse Rotolo collected the blood and placed it into a PERK. When Nurse Rotolo completed her examination, she provided Detective Pritchyk with a sealed PERK. Without opening either Kumar's PERK or J.C.'s PERK, Detective Pritchyk delivered both, in their sealed condition, to the Department of Forensic Science ("DFS") that same day. In a separate package, Detective Pritchyk delivered a towel and bedding collected from Kumar's apartment.

Kumar posted bond, but did not appear for his preliminary hearing. Instead, he fled to India. He would not reappear in the United States for nearly twenty years.

C. The Peripatetic Path of the Physical Evidence: 1995 to 2013

*1. Zervos*

Caroline Zervos was an analytical chemist assistant at the serology section of DFS in 1994 and 1995. Her job duties included conducting inventories of PERKs, as well as storing and preserving evidence in a manner that would facilitate later testing of such evidence. Zervos took an inventory of the two PERKs, which she identified at trial, based on the presence of her initials. Using the blood samples in the PERKs, Zervos created blood stain cards[2] for Kumar and for J.C. At trial, Zervos recalled that the blood vials for J.C. and Kumar had purple tops and that, upon creating the blood stain cards, she initialed and dated each one. The blood stain cards also

---

[2] A blood stain card is a folded piece of paper which is soaked with blood from the blood sample and allowed to dry, and from which smaller portions can then be cut and tested at a later date.

contained the assigned DFS case number and the name of the individual whose blood was tested. Zervos testified that she dried the underwear in J.C.'s PERK to preserve any evidence on it.

### 2. *Ambrozy*

After Zervos finished with the evidence, Karen Ambrozy, a forensic scientist at DFS, received the two PERKs. Both were sealed. Among the items inside J.C.'s PERK was a paper bag containing a pair of white cotton underwear. Ambrozy tested the crotch panel of the underwear and located a seminal fluid stain in the rear portion. At trial, Ambrozy explained that she cut a swatch of fabric containing the seminal fluid stain from the underwear so that she could conduct additional tests. Ambrozy placed that swatch of fabric in a bag and sealed it and initialed it. She dated it and identified it with the laboratory case number.

Ambrozy also cut samples from the blood stain cards created by Zervos. Upon opening this evidence, Ambrozy placed her initials on the red tape along with the date. Ambrozy extracted DNA from the blood stain cards of Kumar and J.C. and compared it to the DNA extracted from J.C.'s underwear. Based upon her findings, Ambrozy created a certificate of analysis dated March 21, 1995.[3] This certificate found that "the DNA profile obtained from the sperm fraction of the underpants stain . . . is consistent with the DNA profile of Umesh Kumar."

Ambrozy placed the two blood stain cards and the underwear swatch, still packaged in separate, sealed bags, in a manila envelope and transferred them to the DFS "security section" for transport to a different DFS laboratory for additional, more sophisticated DNA tests. Ambrozy initialed the items before they were transmitted.

---

[3] Although Ambrozy extracted DNA from Kumar's blood stain card, she did not analyze any other items in his PERK for DNA evidence.

### 3. Pomposini

David Pomposini, a forensic scientist for DFS, received the evidence from Ambrozy. Pomposini noted that the evidence was shipped to him via lockbox. At trial, Pomposini identified his initials on various sealed envelopes, which also contained the DFS case number. Based upon a review of his notes, Pomposini testified in detail regarding the tests he performed on the swatch of fabric taken from J.C.'s underwear. After he completed the tests, Pomposini recorded the case number and his initials directly on the fabric. Pomposini also testified that he performed a DNA analysis of the blood on the blood stain cards of both Kumar and J.C. After he was finished, he resealed the items in their original plastic bags before returning them to DFS in northern Virginia in the original manila envelope.

Based upon Pomposini's tests, he created a certificate of analysis, which was admitted at trial. Like the certificate Ambrozy issued, this certificate indicated that "[t]he DNA profile obtained from the underpants stain . . . is consistent with the DNA profile from Umesh Kumar." Here, however, the conclusion was expressed with even greater statistical certainty than the conclusion in the certificate generated by Ambrozy.

No tests were ever performed on the towel and bedding taken from Kumar's apartment. DFS returned the two PERKs, J.C.'s clothing (minus the sample of fabric that Ambrozy cut and retained from the stained crotch of J.C.'s underwear), and the towel and bedding to Detective Pritchyk. DFS retained three items: Kumar's blood stain card, J.C.'s blood stain card, and a sample of fabric cut from the stained crotch of J.C.'s underwear.

### 4. Detective Pritchyk

Detective Pritchyk picked up the two PERKs, the bedding and towel, and J.C.'s clothing (minus the sample of fabric that Ambrozy cut and retained from the stained crotch of J.C.'s underwear), and stored it in the basement property room in the police evidence building behind

the Massey Building where he worked. On a separate trip to DFS, Detective Pritchyk retrieved the remaining three items DFS had initially retained (the two blood stain cards and the fabric sample from the underwear). These items were in an envelope. Detective Pritchyk put his initials on the back of the envelope next to "2/14/96." He did not open the envelope, nor did he store this envelope in the property room with the rest of the evidence. Instead, he placed it in his investigative file folder and put the folder in an unlocked file cabinet on the secured eighth floor of the Massey Building where he worked. He did not check the seal at that time.

### 5. *Detective Bridge*

Prior to Detective Pritchyk's retirement, Fairfax County Police Department Detective Eric Bridge worked in the child abuse unit at the CIB. In 1998, Detective Bridge reviewed J.C.'s case file to determine whether anything further was required to prepare the case for prosecution. As part of this review process, Detective Bridge opened Detective Pritchyk's file. When he did so, he noticed that it contained "a manilla [sic] envelop[e] that appeared to have evidence that was returned from the lab." He testified that storing evidence in a file was consistent with police protocol at that time. Detective Bridge identified the envelope at trial, which bore his initials, along with the date "3/15/99." Detective Bridge noted that he "assumed" the date referred to the time he opened the envelope, examined the contents, resealed the envelope, and returned it to the file. Detective Bridge's "procedure and routine" at the time dictated that whenever he "came into contact with evidence," he initialed it. Upon examining the plastic bags of evidence inside the envelope at trial, Detective Bridge noted that his initials did not appear on the plastic bags. Detective Bridge explained that the "procedure" he followed at that time required him to initial the bags only if he broke the seal. The absence of his initials on the evidence bags indicated that Detective Bridge did not open them.

While he was reviewing the file, Detective Bridge kept it in his desk drawer in his cubicle. The drawer was not locked, but Detective Bridge's office was on the locked eighth floor of the Massey Building where other detectives worked. Detective Bridge noted that the building was a "secured access" building, as was the eighth floor. One security code was required to enter the building, and a second security code was required to access the eighth floor. Following his review of the file, Detective Bridge returned the file to the active case file cabinet "right outside" his office cubicle on the eighth floor.

### 6. Destruction of the PERKs, Bedding, and Towel

Shortly before Detective Pritchyk's retirement in 1999, he reviewed his unresolved cases and filled out a "Property Disposition Certification," directing the police department to retain the evidence he had placed in the property room (the two PERKs, the bedding and towel, and J.C.'s clothing—minus the sample of fabric cut from the stained crotch of J.C.'s underwear). That evidence remained in the property room until October 2006. In 2006, the custodian of the evidence, pursuant to a procedure whereby the police purged the property room of unneeded evidence, sent an email to the CIB Sex Crimes Unit and asked whether the evidence could be destroyed. Fairfax County Police Department Second Lieutenant Brenda Akre from the CIB Sex Crimes Unit mistakenly believed that the case had been closed following Kumar's arrest in 1994 and that any opportunity to appeal had passed. Therefore, she responded that the evidence in the property room related to Kumar's case could be destroyed. Thus in 2006, the police destroyed the two PERKs, the bedding and towel, and J.C.'s clothing (minus the sample of fabric cut from J.C.'s underwear).

### 7. Detective Pfeiffer

In 2013 Detective Mark Pfeiffer, a member of the Fairfax County Police Department's cold case squad, received information that Kumar was in Canada and that he had an outstanding

Fairfax County warrant for aggravated sexual battery. After confirming that the evidence in the property room was no longer available, Detective Pfeiffer obtained Detective Pritchyk's case file from archives.[4] In that file, Detective Pfeiffer discovered a sealed, undamaged evidence packet, which contained within it three plastic bags of evidence (containing the two blood stain cards and the sample of fabric cut from J.C.'s underwear). Detective Pfeiffer put his initials and the date he examined the evidence on the envelope housing the three bags, and placed the envelope inside a new envelope, which he sealed and on which he wrote the case number, his initials, and the date.

Detective Pfeiffer testified that he did not tamper with any of the evidence retrieved from Detective Pritchyk's file. He also stated that although he opened the envelope containing the three smaller plastic bags, he did not open the three individual plastic bags themselves. Detective Pfeiffer wrote on the outside of each plastic bag that they were "intact," and the date and the time that he examined them. Detective Pfeiffer placed the new sealed envelope (containing the old envelope that contained the three packets of evidence) in the CIB property locker on the ninth floor of the Massey Building. Detective Pfeiffer confirmed that the building was not open to the general public and required a key card to enter.

Detective Pfeiffer moved the evidence (which he labeled "DNA evidence") to the fifteenth floor of the Massey Building, before moving it again to a locked drawer in his locked office on the twentieth floor. The evidence remained in Detective Pfeiffer's locked drawer for six days before he moved it to the property room behind the courthouse. The property room was accessible only with the permission and under the supervision of property room personnel.

---

[4] Detective Pfeiffer explained that "archives" is a locked facility in Springfield and that only archives employees had access to the area where files were stored. Using the case number, Detective Pfeiffer requested that the file clerk retrieve the file.

On cross-examination, Detective Pfeiffer acknowledged he did not know how the DNA evidence in Detective Pritchyk's file came to be stored at archives or who requested that it be stored there. Likewise, he did not know how long the evidence had been stored at archives. He also testified that he had never stored DNA evidence in his own case files, but this was not the first time he had seen such evidence stored in this manner in older files.

### D. Kumar's Reappearance: 2013 to 2014

#### 1. Detective Hinson Returns Evidence to DFS

In 2013, Detective Jeremy Hinson, a member of the Fairfax County Police Department's cold case squad, took over the case from Detective Pfeiffer. Detective Hinson began coordinating with the Government of Canada and the United States Department of Justice to arrange for Kumar's extradition from Canada. In July 2013 Detective Hinson retrieved the items of evidence that Detective Pfeiffer had placed in the property room and transported them to DFS for additional tests. At the lab, Detective Hinson opened the sealed exterior envelope to confirm its contents. Detective Hinson noted his name, badge number, and the time and date. After confirming the contents, he re-sealed the envelope and again noted the time, date, and his initials and badge number. He did not handle the three packets of evidence inside the envelope. At trial, Detective Hinson testified that he submitted this evidence to the lab for testing, notwithstanding the fact that it had already been tested back in 1995, because of the availability of "newer technology." Detective Hinson completed a request for laboratory examination, labeling the three items of evidence "BLOOD FROM [J.C.]," "STAIN FROM [J.C.]'S UNDERPANTS," and "BLOOD FROM KUMAR." Detective Hinson requested that DFS "TEST ITEMS FOR DNA PROFILE (RESUBMITTED)."

## 2. *Ambrozy Retests the Blood and Underwear*

Ambrozy, still employed by DFS, took possession of the resubmitted evidence in 2013. At trial, she testified that she recognized the envelope containing the three smaller bags because it bore her initials and the "unique laboratory number" assigned to this case. Ambrozy noted that when she opened the larger envelope, it contained "the original envelope that [she] generated from 1994 and 1995 and continued [sic] the samples . . . which are the blood stain cards from [J.C.], as well as Umesh Kumar, as well as the cutting from the underpants." At trial, the original envelope bore the lab number, Ambrozy's original initials, and her "new initials" from 2013. The interior envelope was not sealed, but was undamaged and did have a clasp closure.

Ambrozy noted that each of the three smaller items was in a separate, sealed plastic bag, and bore her initials, the date, and the laboratory number assigned to the case. She confirmed that the plastic bags were not broken and had no holes in them. Ambrozy also confirmed that the packaging appeared to be the same as it was in 1995 "absent new tape and new initials."

In re-analyzing the evidence, Ambrozy was able to employ DNA science which had improved since her 1995 analysis. In September 2013, Ambrozy prepared a "Supplemental Report" based upon her re-test of the two blood stain cards and the underwear stain. Consistent with her initial certificate of analysis and that prepared by Pomposini, Ambrozy's new tests revealed that "Umesh Kumar cannot be eliminated as a contributor" of the DNA found in the "sperm fraction of the stain from [J.C.'s] underpants." J.C.'s DNA was present in the non-sperm portion of the stain. The statistical similarity between Kumar's DNA and the DNA found on the underwear swatch was significantly greater than that established by the earlier tests. The report concluded that "[t]he probability of randomly selecting an unrelated individual with a DNA profile matching that developed from the sperm fraction of the stain from [J.C.]'s underpants . . .

- 11 -

is 1 in greater than 6.5 billion (which is approximately the world population) in the Caucasian, Black, and Hispanic populations."

E. Kumar's Second Interview:  2014

In February of 2014, Kumar was extradited from Canada to the United States.  Upon Kumar's arrival in Fairfax County, Detective Hinson interviewed him.  Officer Rana Iqbal, a traffic enforcement officer with the Fairfax County Police Department, was also present as a translator.[5]  Police video-recorded the interview, and subsequently transcribed the accompanying audio.  Officer Iqbal did not translate for Detective Hinson everything Kumar said, nor did Officer Iqbal translate for Detective Hinson everything Officer Iqbal said to Kumar.

Detective Hinson provided to Officer Iqbal a card with the Miranda warning printed on it in English.  From that card, Officer Iqbal explained Kumar's rights to him.  The following back and forth then occurred (with Kumar speaking in Hindi, Detective Hinson speaking in English, and Officer Iqbal speaking in Urdu, except where indicated):

| [Officer] Iqbal | These are your rights in the United States. In any kind of investigation.  The number one rights [sic] is that you can keep silent, for any question. |
|---|---|
| Umesh Kumar | Okay. |
| [Officer] Iqbal | It is not necessary that you answer every question.  Any time or any question.  If you don't want to answer any question, you can stay quite [sic]. |

_____

[5] Officer Iqbal and Kumar did not speak an identical language.  Kumar, a native of India, spoke primarily Hindi; Officer Iqbal, a native of Pakistan, spoke primarily Urdu.  At the suppression hearing, Officer Iqbal explained the relationship between the two languages:  "Hindi is mostly and widely sp[oken] in India and on Pakistan['s] side, they call [it] Urdu, and a lot of phrases and words are the same, even the movies they are watching on both side[s]."  The two languages, testified Officer Iqbal, were "like 70 to 80 percent the same."  At the time of the interview, in explaining the languages to Detective Hinson, Officer Iqbal likened the relationship between Hindi and Urdu to that between Spanish as spoken in Spain and Spanish as spoken in Puerto Rico.  On appeal, Kumar does not challenge the adequacy or accuracy of the translation, only the trial court's ruling on when he invoked his right to counsel.

- 12 -

| | |
|---|---|
| Umesh Kumar | Okay. |
| [Officer] Iqbal | Whatever you say may be used against you in the court. |
| Umesh Kumar | Okay. |
| [Officer] Iqbal | As evidence.  You have the right to talk to your lawyer when we question you.  You can say that you cannot answer. |
| Umesh Kumar | I have to talk to the lawyer. |
| [Officer] Iqbal | I have to talk to the lawyer.  He will talk to you. |
| Umesh Kumar | Okay. |
| [Officer] Iqbal | [unintelligible]  You can ask. |
| Umesh Kumar | Okay. |
| [Officer] Iqbal | If you don't have money to make a call, the county will provide a lawyer to you free of cost.  If you want to give [unintelligible], you have the right to stop the questions at any time. |
| Umesh Kumar | Okay. |
| [Officer]Iqbal | These are your rights.  Do you understand everything I have read? |
| Umesh Kumar | Yes. |
| [Officer] Iqbal | I have read everything to you, all the rights. Now questions will be asked, you can use your rights. |
| Umesh Kumar | Okay. |
| [Officer] Iqbal | If you don't want to answer any question, you feel bothered by any question, you can say you want to talk to your attorney. |
| Umesh Kumar | Okay, I will talk to the attorney and then answer. |

| [Officer] Iqbal | [in English]  I have explained all the 5 rules and explaining so he [unintelligible] rights[.] |
|---|---|
| Detective Hinson | Are you willing to speak to me? |
| [Officer] Iqbal | You want to talk to him? |
| Umesh Kumar | Yes. |

Kumar then spoke with Detective Hinson through Officer Iqbal for several minutes without mentioning a lawyer.  Detective Hinson explained to Kumar "your semen was found on the underwear and doesn't match with anyone else."  Detective Hinson also told Kumar that J.C. "still remembers now what happened."  Officer Iqbal related to Kumar that "[Detective Hinson] says, I know why you ran away from here, because man gets scared, you got scared and so you left."  In response, Kumar stated, "I did the mistake and so I left."

Officer Iqbal later told Kumar that, "[w]hatever happened, there is evidence for that."  Kumar responded, "It is present, absolutely.  I will talk to my lawyer, I don't know anything.  I want to be forgiven.  I wanted to keep my parents happy."  Officer Iqbal then related to Detective Hinson "for further kind of question, he thought he can have an attorney so he can explain to them, he will be comfortable with his own attorney."  When Officer Iqbal asked Kumar if he still wanted to talk with them, Kumar initially stated it "will be better if the lawyer is there," then stated, "I don't know," and finally concluded he did not want to answer any further questions without an attorney present.  Questioning of Kumar then ceased.

### F.  Pretrial Motions and Trial

Prior to trial, Kumar moved to dismiss for failure to provide exculpatory evidence.  He also moved to suppress his statements made at the second interview.[6]  The trial court heard

---

[6] Kumar's motion to suppress also sought to exclude certain statements he made to Canadian officials about how he entered that country.  The trial court granted that portion of Kumar's motion to suppress, and his statements to the Canadian officials were not introduced at trial.

testimony from witnesses, admitted several exhibits, and reviewed both the videotape and transcript of Detective Hinson's interview of Kumar. The trial court denied the motion to dismiss, as well as the motion to suppress Kumar's statements to Detective Hinson. After a four-day trial, a jury convicted Kumar of aggravated sexual battery and recommended a sentence of eleven years in the penitentiary, which the trial court imposed. Kumar then noted his appeal.

II. ANALYSIS

A. Motion to Dismiss

Prior to trial, Kumar moved to dismiss the charge against him. He alleged that the Commonwealth had failed to preserve exculpatory evidence. On appeal, he asserts that the trial court erred by denying his motion to dismiss. Kumar notes that the towel and the bedding were destroyed before he or the Commonwealth tested them. He argues that, in light of J.C.'s testimony that the attack occurred on the bed and that Kumar wiped her off with a towel afterwards, "if these items were tested and his DNA was not present, they would be exculpatory."

"The suppression of exculpatory evidence by the government violates due process if the evidence is material to either guilt or punishment . . . ." Taylor v. Commonwealth, 4 Va. App. 45, 48, 354 S.E.2d 74, 76-77 (1987). Because Kumar's due process claim raises a constitutional question, we review it *de novo*. Wilkins v. Commonwealth, 292 Va. 2, 7, 786 S.E.2d 156, 159 (2016). In support of his assertion that the trial court erred by failing to dismiss the charge, Kumar relies on California v. Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 488 U.S. 51 (1988). We agree that those cases guide our analysis of this assignment of error. In Gagelonia v. Commonwealth, 52 Va. App. 99, 661 S.E.2d 502 (2008), a panel of this Court synthesized the holdings of those two cases, observing that

> a defendant seeking a new trial on the basis of missing evidence
> formerly in the Commonwealth's possession must show that

(1) the evidence possessed an apparent exculpatory value, (2) the defendant could not obtain comparable evidence from other sources, and (3) the Commonwealth, in failing to preserve the evidence, acted in bad faith.

Id. at 115, 661 S.E.2d at 510. Kumar's claim fails because he has shown neither the apparent exculpatory value of the evidence nor bad faith on the part of the Commonwealth.

### 1. No Apparent Exculpatory Value

"Brady [v. Maryland, 373 U.S. 83 (1963),] and its progeny pertain to exculpatory evidence still in the government's possession, of which the exculpatory value is known." Gagelonia, 52 Va. App. at 114, 661 S.E.2d at 510. However, Youngblood "pertain[s] to evidence that is no longer in the government's possession, whose exculpatory value, if any, is *unknown*." Id. (emphasis added). Kumar argues that "if [the towel and bedsheet] were tested and his DNA was not present, they would be exculpatory." This argument raises no more than the speculative possibility that untested evidence could have exculpated him. But "the possibility that evidence could have exculpated a defendant depending on future testing results is not enough to satisfy the constitutional standard of materiality." Lovitt v. Warden, 266 Va. 216, 241, 585 S.E.2d 801, 815 (2003). For that reason, we find that the evidence destroyed by the Commonwealth did not possess "apparent exculpatory value." Gagelonia, 52 Va. App. at 115, 661 S.E.2d at 510.[7]

### 2. No Bad Faith by the Commonwealth

Kumar's failure to satisfy one part of the three-part conjunctive test described in Gagelonia means that this assignment of error fails. However, Kumar also failed to satisfy

---

[7] We note here that the trial court found that the destroyed evidence did possess apparent exculpatory value. Because we review this question *de novo*, we are not bound by the trial court's finding.

another part of this test, because he did not show that there was any bad faith underlying the Commonwealth's destruction of the evidence.

> The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it *could have* been subjected to tests, the results of which *might have* exonerated the defendant.

Youngblood, 488 U.S. at 57 (emphases added). Thus "under the Youngblood standard, a state's failure to preserve potentially useful evidence does not constitute a denial of due process unless a defendant can show bad faith on the part of the state." Lovitt, 266 Va. at 241, 585 S.E.2d at 815. "The presence or absence of bad faith by the state depends on whether agents of the state had knowledge of the exculpatory value of the evidence when it was lost or destroyed." Id.

The trial court's "determination that there was an absence of bad faith was a finding of fact, not of law." Id. "Such factual findings made by the circuit court are entitled to deference and are binding in this proceeding unless they are plainly wrong or without evidence to support them." Id. at 241, 585 S.E.2d at 816.

In denying Kumar's motion to dismiss, the trial court found that the Commonwealth did not act in bad faith.[8] This factual finding was not plainly wrong, and is thus binding on this Court. The police department was not selective in the evidence it destroyed. It destroyed all of the evidence in the property room relating to Kumar's case, including both PERKs, J.C.'s clothing (minus the sample of fabric that Ambrozy cut from the stained crotch of J.C.'s underwear), and the towel and bedding. Furthermore, the request for permission to destroy the evidence came from the property custodian, not from anyone investigating Kumar's case.

---

[8] Though the trial court conceded that Second Lieutenant Akre's decision to authorize the destruction of the evidence "was more than simple negligence" and "trouble[d] the [c]ourt."

Kumar fled the United States over a decade before the destruction of the evidence in 2006. His case had long since gone "cold," and no one was actively investigating it. Second Lieutenant Akre testified that she authorized the destruction of the evidence because she thought the perpetrator had been arrested and the appeal period had expired. Nothing in the record suggests that the police had any knowledge that the towel or bedding contained exculpatory evidence. Thus, the evidence supported the trial court's finding that the police did not act in bad faith by destroying the towel and the bedding. As such, we affirm the trial court's decision to deny Kumar's motion to dismiss for failure to preserve exculpatory evidence.

## B. Motion to Suppress

Kumar assigns error to the trial court's denial of his motion to suppress his statements to Detective Hinson. "In reviewing a trial court's denial of a motion to suppress, 'the burden is upon [the defendant] to show that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (alteration in original) (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)). "Whether a defendant has invoked his right to have counsel present during a custodial interrogation presents a mixed question of law and fact." Burrell v. Commonwealth, 58 Va. App. 417, 427, 710 S.E.2d 509, 514 (2011). Factually, "[w]e accept the trial court's finding regarding what a defendant actually said, unless it is 'plainly wrong or without evidence to support it.'" Id. (citation omitted) (quoting Hickson v. Commonwealth, 258 Va. 383, 387, 520 S.E.2d 643, 645 (1999)). Legally, we review de novo "whether the defendant's statement effectively invoked a right to counsel."

Id.  We "review findings of historical fact only for clear error[9] and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 693 (1996).

"When police interrogate a suspect in their custody, they first must give a Miranda warning informing the suspect of the right to an attorney and the right to have that attorney present during the interrogation."  Commonwealth v. Quarles, 283 Va. 214, 220, 720 S.E.2d 84, 87 (2012).  Kumar was in custody and Detective Hinson was interrogating him, so the police were required to advise Kumar of his Miranda rights.  On appeal, Kumar does not dispute that the police adequately advised him of those rights, and does not deny that he understood them.  Instead, the motion to suppress turns on when Kumar invoked one of those rights, specifically his right to have counsel present during questioning.

Kumar argues that the trial court erred by admitting his statements to Detective Hinson during their interview because Kumar invoked his right to counsel prior to making those statements.  Specifically, Kumar contends the trial court should have suppressed his statement in response to Detective Hinson's comment that he understood why Kumar returned to India, when Kumar stated, "I did the mistake and so I left."  Kumar argues that this statement should have been suppressed because he invoked his right to have his lawyer present from the outset of the interview.  He contends that he invoked his right to counsel immediately after Officer Iqbal explained Kumar's right to counsel.

> Whether a suspect has invoked his right to counsel during a custodial interrogation is an objective inquiry and the invocation of the request for counsel must be such that "a reasonable officer in

---

9 The term "'[c]lear error' is a term of art derived from . . . the Federal Rules of Civil Procedure."  Ornelas v. United States, 517 U.S. 690, 694 n.3 (1996).  "In Virginia, questions of fact are binding on appeal unless 'plainly wrong.'"  McGee, 25 Va. App. at 198 n.1, 487 S.E.2d at 261 n.1 (citing Quantum Dev. Co. v. Luckett, 242 Va. 159, 161, 409 S.E.2d 121, 122 (1991), and Naulty v. Commonwealth, 2 Va. App. 523, 527, 346 S.E.2d 540, 542 (1986)).

light of the circumstances" would understand the statement to be a request to have counsel present for the interrogation.

Stevens v. Commonwealth, 283 Va. 296, 304, 720 S.E.2d 80, 83-84 (2012) (emphasis omitted) (quoting Davis v. United States, 512 U.S. 452, 459 (1994)). When determining whether a defendant unambiguously asserted his Fifth Amendment right to counsel, a court is not limited to a single statement or to considering only the words spoken. Id. at 303-04, 720 S.E.2d at 83-84. The circumstances preceding[10] the request are also relevant. Id.

Here, the trial court watched a video recording of the interview and found that the statement, "I have to talk to a lawyer . . . was not a clear and unequivocal assertion of his right." Rather, the trial court concluded that, in context, Kumar's references to counsel prior to the start of questioning were simply a repetition of the rights as they were being explained to him by Officer Iqbal. The trial court observed that Kumar and Officer Iqbal were "fully engaged" with each other and that Kumar's statement was "simply repeating the rights that were told to him." The trial court also found that Officer Iqbal advised Kumar that if Kumar became "bothered" by any question, he could say that he wanted to speak with an attorney. Consistent with that instruction, the trial court said, Kumar "freely answers questions until the moment he become[s] uncomfortable." The trial court observed that "Mr. Kumar's response is, okay, I will talk to the attorney and then answer. But it's an answer to a conditional question. The question is, if you don't want to answer any question, if you feel bothered by any question you can say you want to talk to an attorney."

We agree with the trial court's conclusion that while Kumar used the words "lawyer" and "attorney," he was essentially repeating back the rights as they were explained to him and that

---

[10] By contrast, "post-request responses to questioning may not be used to 'cast retrospective doubt on the clarity of the initial request itself.'" Stevens, 283 Va. at 303, 720 S.E.2d at 83 (quoting Smith v. Illinois, 469 U.S. 91, 100 (1984)).

Kumar did not invoke his right to counsel until after he stated he "did the mistake." Especially in light of the fact that Kumar's understanding of the rights explained to him is not at issue on appeal, we find that the trial court's denial of the motion to suppress is supported by the record and was not "plainly wrong." See Burrell, 58 Va. App. at 427, 710 S.E.2d at 514. Based upon the circumstances, a reasonable police officer could have concluded that Kumar was not invoking his right to counsel, but rather was repeating the substance of Officer Iqbal's statements, when he said "I have to talk to the lawyer" and "Okay, I will talk to the attorney and then answer." This conclusion is further supported by Kumar's direct statement that he wanted to talk to Detective Hinson after having been advised of his rights. Accordingly, the trial court did not err by denying Kumar's motion to suppress.

Even assuming, however, that the trial court erred by denying the motion, the error was harmless beyond a reasonable doubt. "[I]t is 'the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless' lest they 'retreat from their responsibility, becoming instead "impregnable citadels of technicality."'" Commonwealth v. White, ___ Va. ___, ___, 799 S.E.2d 494, 498 (2017) (quoting United States v. Hasting, 461 U.S. 499, 509 (1983) (alteration and citation omitted)). Consideration of statements obtained in violation of a suspect's right to have counsel present during custodial interrogation is a constitutional error, but "[c]onstitutional error, like other types of error, remains subject to analysis under the doctrine of harmless error." Id. at ___, 799 S.E.2d at 498-99 (quoting Foltz v. Commonwealth, 284 Va. 467, 472, 732 S.E.2d 4, 7 (2012)). "When a federal constitutional error is involved, a reviewing court must reverse the judgment unless it determines that the error is harmless beyond a reasonable doubt." Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001).

> In making that determination, the reviewing court is to consider a
> host of factors, including the importance of the tainted evidence in

the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case.

Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999). Constitutional harmless error analysis is not simply a matter of assessing the sufficiency of the evidence. White, ___ Va. at ___, 799 S.E.2d at 500. A sufficiency analysis "asks whether a rational jury *could have* found the defendant guilty." Id. Constitutional harmless error analysis, by contrast, "looks at the other side of the reasonable-doubt spectrum: 'Is it clear beyond a reasonable doubt that a rational [factfinder] *would have* found the defendant guilty absent the error?'" Id. (quoting Neder v. United States, 527 U.S. 1, 18 (1999) (emphasis added)).

Here, J.C. testified that Kumar rubbed his penis against her buttocks when she was four years old and that, immediately afterward, she felt wetness in her underwear. Upon reporting the incident to her mother, J.C. underwent an examination while wearing the same underwear she wore during the crime. Sperm and DNA matching that of Kumar were recovered from the crotch of the underwear.

Kumar's aunt, Champa, testified that she babysat J.C. and that, on the day of the crime, she had left Kumar alone with J.C. while she ran an errand. A neighbor who visited the apartment during Champa's absence that day also confirmed that Kumar was in the apartment on the afternoon of the crime. Coupled with Kumar's flight from the country following his arrest, the evidence of Kumar's guilt was overwhelming. See Thomas v. Commonwealth, 279 Va. 131, 168, 688 S.E.2d 220, 240 (2010) (noting that when a suspect "attempts to escape or evade a threatened prosecution, it may be argued that he does so from consciousness of guilt" and that, while such "inference is by no means strong enough by itself to warrant a conviction, . . . it may become one of a series of circumstances from which guilt may be inferred" (quoting Anderson v. Commonwealth, 100 Va. 860, 863, 42 S.E. 865, 865 (1902))).

Thus, even if the admission of Kumar's statement violated his constitutional right to counsel, the statement, which could have been interpreted as his "mistake" in leaving the country, rather than his "mistake" in committing the aggravated sexual battery, was relatively insignificant in comparison to the evidence identifying him as the perpetrator. We find it "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Neder, 527 U.S. at 18. Accordingly, to the extent the trial court committed any error when it denied Kumar's motion to suppress, that error was harmless.

### C. Chain of Custody

Kumar alleges that proper chain of custody was not maintained for Exhibits 11, 12, 13, 14, 15, 23, 24, and 25. Those exhibits correspond to the following evidence:

| | |
|---|---|
| 11: | New outer envelope created by Detective Pfeiffer, containing Exhibit 12 |
| 12: | Old envelope containing Exhibits 13, 14, and 15 |
| 13: | Blood stain card for J.C. |
| 14: | Piece of cloth cut from J.C.'s underwear |
| 15: | Blood stain card for Kumar |
| 23: | Certificate of analysis prepared by Karen Ambrozy, dated March 21, 1995 |
| 24: | Certificate of Analysis prepared by David Pomposini, dated October 17, 1995 |
| 25: | Certificate of Analysis and Supplemental Report prepared by Karen Ambrozy, dated September 27, 2013 |

Kumar's argument regarding the chain of custody is two-pronged. First, he contends that the Commonwealth did not maintain a proper chain of custody with respect to the original DNA evidence collected from him and J.C. in December 1994. In support, he observes that the PERKs were destroyed, and the witnesses who testified at trial regarding the chain of custody for the two

- 23 -

PERKs had no independent recollection of their handling of the kits, instead relying solely on their reports and notes. Second, Kumar argues that even if the chain of custody was sufficient to admit the DNA tests performed in 1995, problems with the chain of custody in the years afterwards should have resulted in the exclusion of the 2013 certificates of analysis.

We review the trial court's determination regarding the adequacy of chain of custody for abuse of discretion. Pope v. Commonwealth, 60 Va. App. 486, 511, 729 S.E.2d 751, 763 (2012). Essentially, Kumar asks this Court to rule that an imperfect chain of custody necessarily results in a legally deficient chain of custody. That is not the law. Although the prosecution is required to establish every "vital link in the chain of possession" when introducing the results of forensic analysis, Robinson v. Commonwealth, 212 Va. 136, 138, 183 S.E.2d 179, 180 (1971), the Commonwealth need not eliminate "all possibility of tampering," id. (quoting People v. Riser, 305 P.2d 1, 10 (Cal. 1957)). "[G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." Aguilar v. Commonwealth, 280 Va. 322, 332-33, 699 S.E.2d 215, 220 (2010) (alterations in original) (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n.1 (2009)). The chain of custody rule requires "a showing with reasonable certainty that the item [has] not been altered, substituted, or contaminated prior to analysis, in any way that would affect the results of the analysis." Reedy v. Commonwealth, 9 Va. App. 386, 387-88, 388 S.E.2d 650, 650-51 (1990) (quoting Washington v. Commonwealth, 228 Va. 535, 550, 323 S.E.2d 577, 587 (1984)). "Where there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." Id. at 391, 388 S.E.2d at 652.

### 1. Exhibits 11, 12, 13, 14, 15, 23, and 24

Even if the DFS employees testifying at trial in 2015 could not independently recall all of their actions at the time they handled the PERK evidence in 1994 and 1995, they testified that

- 24 -

they recognized their initials, the case number, and the dates that they handled or tested the evidence. Furthermore, Detective Pritchyk independently recalled collecting the PERK evidence from Nurse Rotolo and transporting it personally to DFS.

Other than the witnesses lacking specific recollection of their handling of the evidence, Kumar cites the following gaps in the chain of custody:

Zervos: Kumar notes that Zervos did not testify to how she came into possession of the PERKs from which she developed the blood stain cards and obtained and dried the underwear. Furthermore, Kumar points out that Zervos did not independently recognize the packaging of the blood stain cards and that her initials did not appear on them. Finally, Kumar notes that Zervos's records indicate that Kumar's PERK contained a pubic area swab, saliva, and hair, in contrast to Nurse Rotolo's testimony that she recalled collecting only blood from Kumar.

Ambrozy: Kumar argues a gap in the chain of custody was created because Ambrozy could not recall how she came into possession of the PERKs.

Pomposini: Kumar maintains that no evidence established how Pomposini stored the blood stain cards and underwear after he received them.

Nurse Rotolo/Brown: Kumar asserts that the chain of the custody for the original PERKs was not established because the DNA evidence was collected by Sue Brown, and Sue Brown did not testify at trial.

Most of Kumar's objections to the chain of custody revolve around how the exhibits were handled, stored, and transported after DFS employees took custody of the exhibits.

> When the Commonwealth introduces a certificate of analysis as evidence of the chain of custody of the material described in the certificate, the certificate of analysis serves as prima facie evidence of the chain of custody of the material tested during the time the evidence is in the custody of the laboratory.

Herndon v. Commonwealth, 280 Va. 138, 143, 694 S.E.2d 618, 620 (2010); see also Code § 19.2-187.01.  We find that the trial court did not abuse its discretion when it found that proper chain of custody was maintained at the lab.[11]  Accordingly, assuming the Commonwealth accounted for the chain of custody leading up to the deposit of the DNA evidence with DFS, the trial court did not abuse its discretion by admitting the evidence prepared in 1995 by DFS personnel, including the two certificates of analysis and the blood stain cards and fabric swatch.

Thus, the dispositive issue regarding chain of custody is whether the PERK evidence was accounted for between the time of collection and the receipt of the evidence by DFS.  With regard to Detective Pritchyk, he testified that he obtained the PERK evidence directly from Nurse Rotolo after she completed her examination of J.C. and Kumar.  He placed J.C.'s sealed PERK in his office briefly before retrieving it the same day and hand-delivering it, along with Kumar's PERK, to DFS.  This delivery occurred on the same day the evidence was collected.

With respect to Sue Brown, the record reveals that Suzanne Rotolo testified that she collected the DNA evidence from J.C. and Kumar.  While neither party established during their examination of Nurse Rotolo that she was known as "Sue Brown" at the time of the DNA collection, both parties referred to her interchangeably as Sue Brown and Rotolo during their chain of custody argument to the trial court.  Detective Pritchyk testified:  "I called the sexual assault nurse, Sue Brown, at that time, called her to come to my office and the Criminal

---

[11] Although Zervos did not see her initials on the final packaging for the blood stain cards and underwear swatch, she testified that her initials appeared on the back of the blood stain cards themselves, along with the date that she initialed the cards.  Also on each card was the name of the individual whose blood was being tested and the laboratory case number.  Likewise, Ambrozy initialed the plastic bags in which she placed blood stain cards created by Zervos prior to their submission to Pomposini for additional DNA tests.  And though Nurse Rotolo did not recall collecting hair and pubic swabs from Kumar at the time she collected blood for the PERK, she did not deny having collected such evidence.

Investigation Bureau to collect some evidence from [Kumar]." Moreover, defense counsel never argued to the trial court that the Commonwealth had failed to establish proper chain of custody because "Sue Brown" did not testify. Accordingly, Kumar has waived his argument that a gap in the chain of custody existed because Sue Brown did not testify. Rule 5A:18.

Pursuant to Rule 5A:18, we "will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998).

> Under this rule, a specific argument must be made to the trial court
> at the appropriate time, or the allegation of error will not be
> considered on appeal. A general argument or an abstract reference
> to the law is not sufficient to preserve an issue. Making one
> specific argument on an issue does not preserve a separate legal
> point on the same issue for review.

Edwards v. Commonwealth, 41 Va. App. 752, 760, 589 S.E.2d 444, 448 (2003) (*en banc*) (citations omitted). Kumar does not ask that we consider this argument under the "good cause" or "ends of justice" exceptions in Rule 5A:18, and we decline to do so *sua sponte*. Williams v. Commonwealth, 57 Va. App. 341, 347, 702 S.E.2d 260, 263 (2010).

Accordingly, the trial court did not abuse its discretion by admitting Exhibits 11, 12, 13, 14, 15, 23, and 24, based upon the chain of custody between the time the evidence was collected in 1994, tested in 1995, and the certificates of analysis were created in 1995.

## 2. *Exhibit 25*

With regard to Exhibit 25, the "supplemental report" Ambrozy prepared on September 27, 2013, Kumar raises additional chain of custody arguments. He asserts that from the time Detective Pritchyk placed Exhibit 12 (which contained Exhibits 13, 14, and 15) in a file folder in an unlocked file cabinet on February 14, 1996, until the time Detective Pritchyk's successor, Detective Bridge, retrieved it on December 30, 1999, the evidence was unsecure, and no testimony established that the items were in the same condition at the time Detective Bridge

retrieved them as they were when they were filed by Detective Pritchyk. Kumar points out that the evidence failed to prove that Detective Bridge retrieved them from the same file cabinet in which Detective Pritchyk placed them, or that they were secure from tampering by third parties. Even assuming the file cabinet was the same, Kumar points out that the file cabinet was not locked. Kumar dismisses Detective Bridge's testimony that the building was not open to the public and that both the building and the eighth floor were secured by separate codes, arguing that other detectives worked on the floor with Detective Bridge and had access to the file cabinet.

Kumar also points out that, with respect to Exhibit 12, Detective Bridge's initials first appear on it beside the date "March 15, 1999." Kumar reasons that this date reflects the first time Detective Bridge handled the evidence and resealed it, but that no evidence established what Detective Bridge did with the evidence between the time he first retrieved the file from the file cabinet on December 30, 1998, and when he examined the contents of the lab envelope on March 15, 1999.

Finally, Kumar contends that no evidence established how Detective Pritchyk's file, containing Exhibits 12, 13, 14, and 15, was moved from the Massey Building, where it had been deposited by Detective Pritchyk and retrieved by Detective Bridge, to the archives building, located in another part of Fairfax County. Kumar points out that no witness accounted for the circumstances under which the file was moved and stored between March 1999 and February 2013, when Detective Pfeiffer retrieved it upon reopening the investigation.

Although there are gaps in the chain of custody regarding the blood stain cards and swatch of underwear fabric after Detective Pritchyk placed them in a CIB file cabinet, Kumar cites no evidence suggesting that the evidence was contaminated or tampered with during the time it was in police custody. Although Detective Pritchyk's file folder (containing two blood stain cards and the underwear swatch) was stored in an unlocked filing cabinet, both the floor

and the building were secured by key codes. From the time Detective Pritchyk placed the evidence in the file cabinet until the time Detective Bridge reviewed it in March 1999, the plastic bags of evidence showed no signs of tampering. Detective Bridge noted his initials on the manila envelope, Exhibit 12, when he opened it to check the contents in March 1999, but his initials did not appear on the sealed plastic bags of evidence. Detective Bridge testified that he would have noted his initials on the bags if he had opened them. Detective Bridge specifically noted that the packages were "intact" when he first examined them in March 1999.

Likewise, although no evidence established how Detective Pritchyk's file was transported from the CIB to the archives facility, no evidence suggests the DNA evidence was tampered with between the time it was examined by Ambrozy in 1995 and the time it was re-examined by her in 2013. Detective Bridge, Detective Pfeiffer, and Detective Hinson testified that the items were stored in sealed packages, and bore no signs of tampering. When Detective Pfeiffer recovered the file from archives, the police were no longer engaged in an active investigation of Kumar. Detective Pfeiffer noted that the evidence was stored in a manner similar to other files Detective Pfeiffer had observed from that period.

Finally, Ambrozy testified that, upon examining Exhibits 13, 14, and 15 in February 2013, they appeared to be in the same condition as they were when she performed the DNA analysis in 1995. Her assessment was borne out by the results of her analysis. Nothing in the supplemental report suggested that DNA which had not been detected during the 1995 analysis was present when Ambrozy analyzed the items in 2013. When the evidence underwent additional DNA analysis, the results were consistent with those shown on the 1995 certificates of analysis. As the original tests revealed, DNA consistent with that of Kumar was found in the seminal fluid stain and DNA consistent with that of J.C. was found outside the seminal fluid

stain. The only difference was the scientific level of certainty that the DNA on the seminal fluid stain belonged to Kumar.

"Where there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." Brown v. Commonwealth, 21 Va. App. 552, 556, 466 S.E.2d 116, 117 (1996) (quoting Reedy, 9 Va. App. at 391, 388 S.E.2d at 652).

Kumar cites Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257 (1955), in support of his argument that the exhibits should have been excluded, but Rodgers is distinguishable from the facts here. In that case:

> [t]he evidence before the jury showed that a sample of the defendant's blood was taken on the night of December 2, 1953, according to standard procedure, and that it was put into two tubes which were sent to Abingdon, according to the best impression of the technician. Whether and how these tubes were labeled was not established. When and by whom they were mailed is not definitely shown. If sent to Abingdon, the evidence does not show who received them there, or how and by whom they were forwarded to Richmond. At some time not shown to the jury a sample of blood "which bore the name of the defendant" was analyzed by Dr. Kaye. When it had been received, in what it had been contained, by whom and in what manner the defendant's name appeared, the evidence does not disclose. Neither container nor labels were produced at the trial.

Id. at 530, 90 S.E.2d at 259. By contrast, the evidence here proved Detective Pritchyk maintained the blood drawn from J.C. and Kumar in sealed packages before personally delivering both to DFS. DFS records corroborated Detective Pritchyk's testimony that he deposited the PERK evidence for both J.C. and Kumar with DFS and that the PERK evidence was sealed at the time it was first opened by Zervos and by Ambrozy.

Likewise, Robinson v. Commonwealth, 212 Va. 136, 183 S.E.2d 179 (1971), on which Kumar relies, does not control our decision. In Robinson a "vital link in the chain of possession" was missing, because only the investigating officer who received the evidence—not the nurse

- 30 -

and another officer who collected the evidence—testified at trial.  Id. at 137-38, 183 S.E.2d at 180-81.  The Supreme Court could not "assume that these exhibits were properly handled" because the Commonwealth "failed to establish this vital link in the chain of possession."  Id. at 138, 183 S.E.2d at 181.  By contrast, in this case both the nurse who collected the evidence, Nurse Rotolo, and the officer who received the evidence, Detective Pritchyk, testified at trial.  Accordingly, the trial court did not err by admitting the exhibits.

### D.  Jury Instruction

Kumar argues that the trial court erred when it refused to instruct the jury that it could draw certain inferences from the destruction of evidence by the police.  "[W]e review the trial court's 'broad discretion in giving or denying instructions requested' for an abuse of discretion." Williams v. Commonwealth, 64 Va. App. 240, 246, 767 S.E.2d 252, 255 (2015) (quoting Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (*en banc*)).  However, when reviewing a trial court's decision not to give a jury instruction, "we view the facts relevant to the determination of that issue in the light most favorable to [the proponent of the instruction]."  Commonwealth v. Cary, 271 Va. 87, 91, 623 S.E.2d 906, 907 (2006)).  On appeal, this Court's "sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises."  Molina v. Commonwealth, 272 Va. 666, 671, 636 S.E.2d 470, 473 (2006) (alteration in original) (quoting Swisher v. Swisher, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1982)).

"This Court reviews the record to determine whether there was more than a scintilla of credible evidence in support of the proponent's jury instruction."  Woods v. Commonwealth, 66 Va. App. 123, 130, 782 S.E.2d 613, 617 (2016).  An instruction not so supported "should not be given.  Thus, it is not error to refuse an instruction when there is no evidence to support it."

Avent v. Commonwealth, 279 Va. 175, 202, 688 S.E.2d 244, 259 (2010) (quoting

Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001)).

> The Virginia appellate courts have not defined the term "scintilla."
> Although this term has a generally accepted meaning of "a spark"
> or "the least particle," see, e.g., Black's Law Dictionary 1345
> (6th ed. 1990), the precise limitations of this term must necessarily
> be determined in the factual context of a particular case. The
> determination whether the minimum quantum of credible evidence
> supports a particular proposition is largely a factor of
> determining the weight of that evidence in comparison to the
> weight of the other credible evidence that negates the proposition
> in question. Therefore, an attempt to establish a comprehensive
> definition of the term scintilla or to draw a brightline limitation of
> the term is neither practical nor helpful. Rather, the weight of the
> credible evidence that will amount to more than a mere scintilla of
> evidence is a matter to be resolved on a case-by-case basis.

Brandau v. Commonwealth, 16 Va. App. 408, 411-12, 430 S.E.2d 563, 565 (1993).

Kumar proposed two alternative instructions on the issue of the destruction of evidence

by the police. Those proposed instructions read as follows:

Instruction N

> You have heard about evidence that was destroyed by the
> police. The defense has argued that this evidence was important to
> the case and that this evidence was only available to the
> Commonwealth and not to the defense. You may infer that this
> evidence was unfavorable to the Commonwealth.

> You may consider these facts in deciding whether the
> Commonwealth has met its burden of proof and you should look at
> all of the evidence or lack of evidence in deciding whether
> Mr. Kumar is guilty or not guilty.

Instruction O

> You have heard about evidence that was destroyed by the
> police. The defense has argued that this evidence was important to
> the case and that this evidence was only available to the
> Commonwealth and not to the defense. You may infer that this
> evidence was beneficial to Mr. Kumar.

> You may consider these facts in deciding whether the
> Commonwealth has met its burden of proof and you should look at

all of the evidence or lack of evidence in deciding whether Mr. Kumar is guilty or not guilty.

Kumar argues that these instructions were proper because more than a scintilla of evidence suggested that the destroyed towel and bedding would have been exculpatory. He asserts that, because the victim stated that the crime occurred on the bed and that the perpetrator cleaned her up with a red towel, the bedding and the towel would have been exculpatory if Kumar's DNA were not present on them.

Brandau, however, makes a subtle point about how courts must determine whether more than a mere scintilla of evidence supports a given proposition. In deciding "whether the minimum quantum of credible evidence supports a particular proposition," a trial court must "determin[e] the weight of that evidence in comparison to the weight of the other credible evidence that negates the proposition in question." Brandau, 16 Va. App. at 411-12, 430 S.E.2d at 565. Kumar testified that he did not commit this crime. He argues that the trial court erred when it implicitly found that his avowal of innocence constituted no more than "a scintilla of credible evidence," Woods, 66 Va. App. at 130, 782 S.E.2d at 617, to support the proposition that his DNA would not have been on the towel and bedding, if the Commonwealth had tested them. We find that the trial court did not abuse its discretion when it implicitly determined that this evidence was no more than a mere scintilla in support of Kumar's proposition, and thus that the trial court did not err when it refused to give either proposed instruction.

Kumar cites no evidence that J.C. identified the towel or bedding collected as the ones present at the scene of the crime.[12] And the testimony Kumar gave at trial, far from buttressing

_____

[12] He maintains that J.C. reported that the towel used by the perpetrator was red, and the towel collected by the police was also red. However, the documents establishing the chain of custody for the evidence do not refer to the towel by color, and contrary to appellant's citation to Detective Pritchyk's testimony, Detective Pritchyk did not testify that the towel collected by the

his claim that his DNA would not have been found on the towel, seems to support the idea that his DNA *would* have been found. Kumar testified that he had sex with a neighbor, and afterwards, "I came into my room and with my towel I cleaned my hands and I rubbed my face and my hands." Kumar asserts on brief that there was "no evidence from the Commonwealth that the items would have been inculpatory." This is inaccurate. The Commonwealth presented "other credible evidence that negates the proposition in question." Brandau, 16 Va. App. at 411-12, 430 S.E.2d at 565, including not just J.C.'s testimony that Kumar wiped himself with a towel after ejaculating, but the subsequent scientific corroboration of that testimony when Kumar's DNA was found in J.C.'s underwear.

Because the instructions proposed by Kumar were not supported by more than a mere "scintilla of credible evidence," Woods, 66 Va. App. at 130, 782 S.E.2d at 617, the trial court did not abuse its discretion by declining to so instruct the jury.

### III. CONCLUSION

First, the trial court did not err when it denied Kumar's motion to dismiss, because Kumar did not show that the destroyed evidence "possessed an apparent exculpatory value," Gagelonia, 52 Va. App. at 115, 661 S.E.2d at 510, nor did he show that "the Commonwealth, in failing to preserve the evidence, acted in bad faith," id. Second, the trial court did not err when it denied Kumar's motion to suppress, because a reasonable police officer could have concluded that Kumar was not invoking his right to counsel. Even assuming that the trial court did err when it denied Kumar's motion to suppress, that error was harmless beyond a reasonable doubt. Third, the trial court did not err when it admitted exhibits notwithstanding Kumar's chain of custody objections. Kumar's arguments constitute no more than "mere speculation that

---

police was red. Rather, Detective Pritchyk testified that when he spoke with the officers who would be searching Kumar's apartment, "I told them that if they saw a *pink* towel take it." (Emphasis added).

contamination or tampering could have occurred," and in such situations, "it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." Brown, 21 Va. App. at 556, 466 S.E.2d at 117 (quoting Reedy, 9 Va. App. at 391, 388 S.E.2d at 652). Fourth, the trial court did not err when it denied Kumar's request for a jury instruction regarding an inference related to the Commonwealth's destruction of evidence, because the proposed instructions were not supported by more than a mere "scintilla of credible evidence." Woods, 66 Va. App. at 130, 782 S.E.2d at 617.

Affirmed.