COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges AtLee, Friedman and Callins
Argued by videoconference


SHYAN J. CSATLOS

MEMORANDUM OPINION[*] BY
v.        Record No. 0851-24-1        JUDGE RICHARD Y. ATLEE, JR.
FEBRUARY 3, 2026

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Afshin Farashahi, Judge

John S. Koehler (Stephen E. Palmer; Mark Allen Satawa; The Law
Office of James Steele, PLLC; Palmer Legal Defense; Satawa Law,
PLLC, on briefs), for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,[1]
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Shyan Csatlos of child abuse and neglect, in

violation of Code § 18.2-371.1(A), and felony homicide, in violation of Code § 18.2-33.  On appeal,

Csatlos argues that the trial court erred by denying her pre-trial motion to dismiss the indictments.

She argues that the Commonwealth violated her right to due process by failing to properly

investigate and preserve potentially exculpatory evidence, and she asks this Court to extend and

apply the principles of *Arizona v. Youngblood*, 488 U.S. 51 (1988), to her case.  Assuming without

deciding that *Youngblood* applies to the circumstances of this case, we find that Csatlos has not

established a violation of due process.  Therefore, we affirm the trial court.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

## I. Background

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth," the prevailing party below. *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).

N.W. was born to Christopher and Elizabeth Willis on May 21, 2019. The couple also had two other children, including five-year old J.W. On August 15, 2019, when N.W. was three months old, he was placed in Csatlos's daycare, which Csatlos operated out of her home in Virginia Beach. Csatlos also provided care for N.W.'s sibling at various times.

Elizabeth dropped her children off at Csatlos's home around 7:24 a.m. on September 17, 2019. Later that morning, Csatlos called and told Elizabeth that when she checked on N.W. he was not "responding" and that EMTs were at the residence treating the child. Elizabeth left work immediately, and when she arrived, the police would not let her go inside. Responders told Elizabeth that the child had a pulse, but he was not breathing on his own. EMTs transported the child to the nearest hospital, where he was stabilized before being transported to the Children's Hospital of the King's Daughters (CHKD). Doctors informed Christopher and Elizabeth that N.W. had suffered head trauma, including both new and old bleeding in his brain, and he had no brain activity. On September 21, after the removal of life support, N.W. died.

Following an autopsy, the medical examiner concluded that N.W.'s cause of death was abusive head trauma. A CT scan from the hospital on the day of the incident indicated "acute-on-chronic" bleeding. The treating physician testified that the acute bleeding would have occurred in the "last couple of days" or the same day, while the chronic bleeding would have occurred in the "week-plus timeframe." The medical examiner opined that the remote, or older, bleeding was likely at least three to four weeks old, while the recent bleeding had been sustained approximately one week before N.W.'s death. There were also injuries to N.W.'s fingers.

Both the police and Child Protective Services (CPS) started an investigation into the incident after N.W. was hospitalized.[2] On October 19, 2020, more than a year after N.W.'s death, a grand jury indicted Csatlos for child abuse and neglect and for the felony murder of N.W. She was arrested shortly thereafter.

During the discovery process, the Commonwealth turned over transcripts of interviews of the witnesses and reports by CPS. A CPS report stated that J.W., N.W.'s five-year old brother, told others that "Daddy shook baby [N.W.]" and "baby [N.W.] hurt his head because Daddy shook him." J.W. made those statements in front of Melissa Schemer, a CHKD Child Life Specialist,[3] and his grandfather, Gary Willis. Csatlos brought these statements to the attention of the Commonwealth and asked for supplemental interviews of those involved.

Following the request, Detective Gauthier of the Virginia Beach Police Department conducted three supplemental interviews. Gauthier, who had been the lead detective on the case, interviewed Gary, but Gary did not recall the statement. Gauthier also interviewed Schemer, who initially reported the statement. Schemer confirmed that she had heard the statement, and she explained that she reported it due to what was then known about the injuries to N.W. Finally, Gauthier interviewed Christopher, who speculated that J.W.'s statement was probably the result of how he explained N.W.'s death to J.W. Christopher explained that J.W. asked how N.W. died, and he told J.W. that "whenever you shake a baby, sometimes their brain gets messed up." Christopher told Gauthier that J.W. asked why someone would shake a baby and, at first, J.W. thought it was like how Christopher played with them, "tickling and stuff like that and kind

_____

[2] CPS started its investigation, in part, based on a report from Csatlos, who was a mandatory reporter. On the evening of September 17, 2019, Csatlos filed a report of possible child abuse with CPS based on the events of that day.

[3] When a child is dying, a Child Life Specialist is "assigned to the family to . . . work with them through the last moments of life" to "advise them, comfort them, [and] keep them in touch with what's going on."

of toss them up in the air." Christopher recalled that he told J.W. it was "kind of like that . . . but a lot more intentional. It happens when someone gets really frustrated or something like that."

At trial, Gauthier testified that he learned about J.W.'s statement on September 23, 2019, just days after N.W. died. He explained that he called Christopher that same day to ask about the statement, and Christopher made the same explanation as he did later during the supplemental interview. That call was not recorded. Gauthier also testified that he spoke to the doctors about the timeline of events and causes of the injuries, and he reviewed the video footage obtained from outside Csatlos's residence. He also observed a forensic interview of J.W. He testified that he then eliminated Christopher as a suspect.

Before trial, Csatlos moved to dismiss the indictments, arguing that the prosecution violated her due process rights under *Arizona v. Youngblood*, 488 U.S. 51 (1988), by failing to investigate the statement. She contended that the police were aware of the statement, made the decision not to investigate the witness or his family about the statement, and thus "failed to secure exculpatory information that is now lost."

The Commonwealth opposed the motion. It argued that *Youngblood* requires a showing of bad faith to constitute a denial of due process, which did not exist because both the Commonwealth and the police pursued the investigation. The Commonwealth was satisfied with Christopher's recollection of the events and felt "that an eight-year-old's recollection of a conversation that occurred three years ago would" be unlikely. It also noted that the *Youngblood* line of cases involved the failure to preserve physical evidence rather than witness testimony.

The trial court denied the motion to dismiss. It found that Csatlos had not demonstrated bad faith on the part of the Commonwealth. Furthermore, the court added that there was no destruction of evidence because it was testimony, and J.W. was still available to be interviewed. It denied the motion without prejudice, noting that Csatlos could renew the motion if the

- 4 -

Commonwealth or the victim's parents prevented Csatlos from questioning J.W., though it noted that it would not necessarily "rule differently in the future."

Csatlos filed a renewed motion to dismiss, alleging that the Commonwealth had since refused her request to interview J.W. She noted that the Commonwealth had attached a second forensic interview with J.W. that had been conducted on October 2, 2019, but the statements were not mentioned during the interview.[4] The Commonwealth clarified that the Willis family did not want the child interviewed, and the Commonwealth equated the refusal with witnesses in other cases who chose not to speak with the defense. The trial court denied the renewed motion to dismiss. It found that there was no destruction of evidence, and, in the alternative, there was no bad faith on the part of the Commonwealth.

The case proceeded to trial, and a jury convicted Csatlos of child neglect and abuse and felony murder. The trial court sentenced Csatlos to 50 years, with 22 years suspended. This appeal followed.

## II. ANALYSIS

Csatlos argues that the Commonwealth's failure to investigate the statements made by J.W., along with its failure to investigate whether Christopher Willis caused N.W.'s death, deprived her of potentially exculpatory evidence in violation of her Fifth and Fourteenth Amendment rights to due process under *Youngblood*. We disagree.

"[D]ue process imposes upon the state an affirmative duty to disclose evidence that tends to exculpate an accused." *Moreno v. Commonwealth*, 10 Va. App. 408, 415 (1990). Evidence is exculpatory if it is "evidence favorable to the accused that is material to guilt or punishment." *Church v. Commonwealth*, 71 Va. App. 107, 117 (2019). "[E]xculpatory evidence still in the

---

[4] At trial, Gauthier conceded that J.W. was not questioned about the statement. He also explained that the forensic interviews are conducted by CHKD and CPS workers.

government's possession, of which the exculpatory value is known," is governed by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *Gagelonia v. Commonwealth*, 52 Va. App. 99, 114 (2008). By contrast, *California v. Trombetta*, 467 U.S. 479 (1984), and *Youngblood* apply "to evidence that is no longer in the government's possession, whose exculpatory value, if any, is unknown." *Gagelonia*, 52 Va. App. at 114.

In *Trombetta*, the United States Supreme Court held that "the government violates due process if the evidence possessed 'exculpatory value that was apparent before the evidence was destroyed, and [the evidence is] of such a nature that the defendant would be unable to obtain comparable evidence by any other reasonable means.'" *Park v. Commonwealth*, 32 Va. App. 407, 420 (2000) (alteration in original) (quoting *Trombetta*, 467 U.S. at 489). But the failure to preserve potentially exculpatory evidence is not necessarily a due process violation. The Supreme Court added a third requirement in *Youngblood*, "holding that if 'a criminal defendant can[not] show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Gagelonia*, 52 Va. App. at 115 (alteration in original) (quoting *Youngblood*, 488 U.S. at 58). Our Court has synthesized the *Trombetta* and *Youngblood* holdings into the following three-part test:

> a defendant seeking a new trial on the basis of missing evidence formerly in the Commonwealth's possession must show that (1) the evidence possessed an apparent exculpatory value, (2) the defendant could not obtain comparable evidence from other sources, and (3) the Commonwealth, in failing to preserve the evidence, acted in bad faith.

*Gagelonia*, 52 Va. App. at 115.

Typically, however, the *Trombetta-Youngblood* cases have dealt with the destruction or loss of *physical* evidence. *See, e.g.*, *Trombetta*, 467 U.S. at 488 (dealing with the failure to preserve breath samples); *Youngblood*, 488 U.S. at 52 (dealing with the failure to preserve semen samples); *Gagelonia*, 52 Va. App. at 114 (dealing with the loss of cell phones and a video tape). This case, on

the other hand, deals not with physical evidence, but with testimonial evidence. Thus, Csatlos asks us to extend the *Youngblood* rule to situations in which, according to her, "the government's intentional disregard for exculpatory evidence results in its destruction or unavailability."

Assuming without deciding that *Youngblood* applies under these circumstances, we find that there is no due process violation because Csatlos did not establish that the Commonwealth acted in bad faith.[5] Whether there is bad faith on the part of the police "for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Gagelonia*, 52 Va. App. at 115 (quoting *Youngblood*, 488 U.S. at 56 n.*). "If it is clear that, had the evidence been properly preserved, it would have formed a basis for exonerating the defendant, then absent a showing to the contrary we must assume that the police were not acting in good faith." *Galbraith v. Commonwealth*, 18 Va. App. 734, 739 (1994) (quoting *Tickel v. Commonwealth*, 11 Va. App. 558, 562-63 (1991)). But a different result is required where no more can be said of the evidence "than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Tickel*, 11 Va. App. at 562-63 (emphasis added) (quoting *Youngblood*, 488 U.S. at 57-68).

Here, the trial court concluded that the Commonwealth did not act in bad faith, and we cannot say that the trial court's finding was plainly wrong or without evidence to support it. *See Lovitt v. Warden*, 266 Va. 216, 241 (2003) ("The circuit court's determination that there was an absence of bad faith was a finding of fact, not of law . . . . Such factual findings made by the

_____

[5] We assume without deciding that *Youngblood* applies because "the doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)). "The 'best' answer to a legal question is the one with which the least number of jurists would disagree or, in other words, the one with which the greatest number of jurists would agree." *Id.* "The 'narrowest' answer to a legal question is the one affecting the least number of cases." *Id.* We find that addressing the bad faith requirement is the best and narrowest ground to resolve this case.

circuit court are entitled to deference and are binding in this proceeding unless they are plainly wrong or without evidence to support them."). Although J.W.'s statements were exculpatory, these statements were turned over. Nothing in the record establishes that further investigation, by questioning a five-year old, would have turned up any additional exculpatory evidence. At best, further investigation *might* have turned up potentially exculpatory evidence. Thus, it is not "clear" that investigation would turn up evidence that "would have formed a basis for exonerating the defendant," and the trial court was not required to assume bad faith. *Galbraith*, 18 Va. App. at 739 (quoting *Tickel*, 11 Va. App. at 562-63).

The lead detective testified that he learned about J.W.'s statement on September 23, 2019, and he questioned Christopher about the statement that same day. The detective also attended the autopsy and questioned the medical professionals about the timeframe of the injuries, and what could have caused them. He observed the video footage of N.W. outside Csatlos's house, which he obtained on September 20, 2019. Based on the information obtained and Christopher's explanation of J.W.'s statement, the detective testified that he eliminated Christopher as a suspect.[6] Thus, as Csatlos acknowledged at oral argument, the police did in fact investigate, if not as thoroughly as Csatlos preferred. *See Youngblood*, 488 U.S. at 58 (holding bad faith not established where failure to test semen samples could "at worst be described as negligent"); *Taylor v. Commonwealth*, 4 Va. App. 45, 50 (1987) (holding "evidence of negligence" insufficient to establish bad faith). Furthermore, when the statements were disclosed to Csatlos and she requested further investigation, the Commonwealth conducted three supplemental interviews of those with knowledge of the statement, including Christopher, the

---

[6] Though the detective did not question J.W. about the statement, the detective explained that he was not permitted to question children under police policy because he was not a SVU detective and had not been trained to interview children.

grandfather, and Schemer.  Thus, the record establishes that the trial court's finding that the Commonwealth did not act in bad faith was not plainly wrong or without evidence to support it.

## III.  Conclusion

For the foregoing reasons, we affirm the trial court's decision.

*Affirmed.*

Friedman, J., concurring.

I join my colleagues in the majority because we are bound by *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *Gagelonia v. Commonwealth*, 52 Va. App. 99 (2008), and under our existing standards, Csatlos has not shown bad faith on the part of the Commonwealth. I write separately to identify some of the problems I see with *Youngblood*'s progeny in Virginia.

The majority opinion correctly states that *Gagelonia* "synthesized" *California v. Trombetta*, 467 U.S. 479 (1984), and *Youngblood* into one three-part test. The effect of this merger is, in my view, too broad—particularly in its application to cases involving destruction of evidence with apparent exculpatory value.

Since *Youngblood* was decided in 1988, different jurisdictions, federal and state, have been unable to agree on the relationship between *Trombetta* and *Youngblood* and have thus settled on different analytical frameworks when applying the cases. As one commentator has explained:

> Some jurisdictions have read *Trombetta* and *Youngblood* as creating separate tests, each of which applies to different types of evidence. In these jurisdictions, *Youngblood* applies if the evidence is potentially exculpatory. The defendant must establish bad faith on the part of the state. In contrast, *Trombetta* applies if the evidence has "apparent exculpatory value" and is otherwise unobtainable; no showing of bad faith is necessary. This approach, in effect, establishes a sliding scale in which the two key variables are bad faith and exculpatory value: the greater or more apparent the exculpatory value, the less the need to establish bad faith.

> Other jurisdictions use a single test that appears to conflate the holdings of *Trombetta* and *Youngblood*. This approach reads *Youngblood* as simply adding a bad faith requirement to the standard articulated in *Trombetta*. Consequently, it fails to differentiate between evidence that is potentially exculpatory and evidence that has apparent exculpatory value; the same test applies to both types of evidence and bad faith must be demonstrated. A three-part test results in which the defendant must show (1) the evidence had apparent exculpatory value, (2) was otherwise unobtainable, and (3) bad faith on the part of the state.

Norman C. Bay, *Old Blood, Bad Blood, and Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith*, 86 Wash. U. L. Rev. 241, 295-96 (2008) (footnotes omitted).

In *Gagelonia*, we chose the latter approach. 52 Va. App. at 115. We were, and we remain, in good company. *See* Bay, *supra*, at 295 n.402 (listing some 18 federal and state cases applying similar three-part tests). After all, some courts see no real distinction between *Trombetta*'s "apparently exculpatory" evidence and *Youngblood*'s "potentially useful" evidence. *Compare McCarthy v. Pollard*, 656 F.3d 478, 484-85 (7th Cir. 2011) (rejecting Wisconsin's bifurcation of *Trombetta* and *Youngblood*, and stating that destruction of "potentially exculpatory evidence" violates due process if, among other things, "the exculpatory value of the evidence was apparent before it was destroyed"), *with United States v. Johnson*, 996 F.3d 200, 206 (4th Cir. 2021) (treating *Trombetta* and *Youngblood* as distinct tests), *and United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994) (same). But conflating the two cases is problematic for a couple reasons.

First, it is at odds with both *Youngblood* itself and United States Supreme Court precedent interpreting *Youngblood*. The *Youngblood* Court held that "[t]he Due Process Clause of the Fourteenth Amendment . . . makes the good or bad faith of the State *irrelevant* when the State fails to disclose to the defendant material exculpatory evidence." *Youngblood*, 488 U.S. at 57 (emphasis added); *see Trombetta*, 467 U.S. at 489 (defining "material exculpatory evidence" as evidence that is essentially irreplaceable and "possess[es] an exculpatory value that was apparent before the evidence was destroyed"). Years later, in reaffirming *Youngblood*, the Court made clear that "the applicability of the bad-faith requirement in *Youngblood* depended . . . on the *distinction* between 'material exculpatory' evidence and 'potentially useful' evidence." *Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (per curiam) (emphasis added); *see also Magraw v. Roden*, 743 F.3d 1, 8 (1st Cir. 2014) ("Fairly read, *Trombetta* and *Youngblood* frame a

dichotomy between evidence that is apparently exculpatory and evidence that is no more than potentially useful."); *United States v. Collins*, 799 F.3d 554, 569 (6th Cir. 2015) ("The first test, established in *Trombetta*, applies in cases where the government fails to preserve material exculpatory evidence, while the second test, established in [*Youngblood*], applies in cases where the government fails to preserve 'potentially useful' evidence."); *Martinez v. State*, 371 P.3d 1100, 1109 (Okla. Crim. App. 2016) ("The bad faith requirement rested instead on the distinction between material exculpatory (i.e., *Brady/Trombetta*) evidence and potentially useful (i.e., *Youngblood*) evidence.").

Second, one of the main reasons for the addition of the "bad faith" requirement in *Youngblood* was that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Youngblood*, 488 U.S. at 57-58 (alteration in original) (quoting *Trombetta*, 467 U.S. at 486). But courts face no such treacherous task when dealing with the kind of apparently exculpatory evidence discussed in *Trombetta*. So, adding a "bad faith" requirement to *Trombetta*—which is what courts are really doing when they "combine" *Trombetta* and *Youngblood* into one three-part test—results in a doctrine untethered from its original meaning and purpose.[7]

---

[7] The utility of *Gagelonia*'s tripartite test is also undermined by *Youngblood*'s own definition of bad faith. The *Youngblood* Court stated that "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." 488 U.S. at 56 n.*. In other words, a defendant who proves that the police were aware of the exculpatory value of the evidence at the time they destroyed it would simultaneously satisfy *Gagelonia*'s first and third prongs. Thus, at best, *Gagelonia*'s three-part test is redundant. At worst, it flouts *Youngblood* and *Trombetta* by requiring "enhanced proof of materiality," thereby compounding an already onerous burden and "screen[ing] out what few cases survive the bad faith hurdle." Bay, *supra*, at 296.

In his prescient concurrence in *Youngblood*, Justice Stevens foresaw that "there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Youngblood*, 488 U.S. at 61 (Stevens, J., concurring). And in *Fisher*, Stevens noted that "*Youngblood*'s focus on the subjective motivation of the police represents a break with our usual understanding that the presence or absence of constitutional error in suppression of evidence cases depends on the character of the evidence, not the character of the person who withholds it." 540 U.S. at 549 n.* (Stevens, J., concurring).

In part because he felt it was "unlikely that the defendant was prejudiced" by the State's failure to preserve the relevant evidence, Stevens opined that *Youngblood* was not one of those cases in which the ostensibly conscientious destruction of evidence rendered the subsequent trial fundamentally unfair. *Youngblood*, 488 U.S. at 61 (Stevens, J., concurring); *see also Fisher*, 540 U.S. at 549 (Stevens, J., concurring) ("This, like *Youngblood*, is not such a case."). To me, however, the present case *is* such a case. And because, in my view, this case falls in the *Trombetta* bucket, it is also a perfect example of the deleterious effects of adding *Youngblood*'s "bad faith" requirement to the *Trombetta* analysis.

It is difficult to overstate how critical J.W.'s comments—or more accurately, a full investigation of those comments—could have been to Csatlos' defense, especially considering the relative tenuity of the Commonwealth's circumstantial evidence.[8] Her case was gutted by the

---

[8] Csatlos had extensive experience as a childcare provider and no prior criminal record. She promptly called for emergency medical services when N.W. went limp and consistently cooperated with authorities. The daycare center was equipped with multiple video cameras; none revealed any shaking incident. The Commonwealth's case rested on the fact that videos from the daycare center showed the child functioning normally earlier in the day. Commonwealth experts asserted that this meant the shaking must have occurred that morning, while N.W. was in Csatlos' care. Defense experts, however, asserted that the child could have been shaken in the hours prior to N.W.'s arrival at the daycare and that he could have succumbed thereafter. In essence, he might have arrived as a ticking time bomb. The victim's brother's

Commonwealth's failure to timely reveal, follow up on, or investigate the fact that just hours before N.W. died, his brother blurted out that someone else had shaken the baby. Years later, when the evidence was eventually turned over to the defense, the Commonwealth hindered Csatlos' ability to question J.W., and the grandfather (who reportedly tried to whisk the loquacious child away at the time) now stated that he had no memory of the incident at all.

Under *Gagelonia*, however, none of that matters because even if J.W.'s comments constituted "material exculpatory evidence," *Youngblood*, 488 U.S. at 57, Csatlos cannot show a due process violation if she cannot show that the Commonwealth acted with bad faith or "official animus." To Csatlos, it does not matter whether there was a bad-faith conspiracy or an unintentional error; it does not matter whether there was malfeasance or nonfeasance. What matters to her is that her case was irreparably damaged by the Commonwealth's actions, resulting in a lengthy incarceration.

For purposes of state constitutional due process protections, *Trombetta* and *Youngblood* are a floor, not a ceiling.[9] *See Vlaming v. West Point Sch. Bd.*, 302 Va. 504, 575 (2023) (holding that the due process protections in the Virginia Constitution "are *at least* as strong as the existing understanding of procedural due-process rights secured by the United States Constitution" (emphasis added)). By adding a "bad faith" requirement to *Trombetta*, *Gagelonia* dips below

---

statement was consistent with this theory that the victim had, in fact, been shaken by someone else.

[9] Some states have chosen to rise above that floor, rejecting *Youngblood*'s "bad faith" requirement in favor of more functional balancing tests rooted in state constitutional due process and aimed at preserving fundamental fairness in every criminal proceeding. *See, e.g.*, *Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326, 1330 n.9 (Alaska 1989); *Hammond v. State*, 569 A.2d 81, 86-87 (Del. 1989); *State v. Matafeo*, 78 P.2d 671, 673 (Haw. 1990); *State v. Smagula*, 578 A.2d 1215, 1217 (N.H. 1990); *Commonwealth v. Henderson*, 582 N.E.2d 496, 496-97 (Mass. 1991); *Ex parte Gingo*, 605 So. 2d 1237, 1241 (Ala. 1992); *State v. Delisle*, 648 A.2d 632, 642-43 (Vt. 1994); *State v. Osakalumi*, 461 S.E.2d 504, 512 (W. Va. 1995); *State v. Morales*, 657 A.2d 585, 590-95 (Conn. 1995); *State v. Ferguson*, 2 S.W.3d 912, 916-17 (Tenn. 1999).

that floor.  We should fix that and place our case law back into harmony with *Trombetta*, *Youngblood*, and *Fisher*.

Furthermore, "[f]airness dictates that when a person's liberty is at stake, the sole fact of whether the police or another state official acted in good or bad faith in failing to preserve evidence cannot be determinative of whether the criminal defendant has received due process of law."  *Fisher*, 540 U.S. at 549 n.\* (Stevens, J., concurring) (alteration in original) (quoting *State v. Morales*, 657 A.2d 585, 593 (Conn. 1995)).  Here, it is hard to a imagine a statement more apparently exculpatory than the victim's brother blurting out that someone else shook the victim in the immediate aftermath of his hospitalization.  Unlike the evidence in *Youngblood*, "of which no more c[ould] be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," J.W.'s comments were exculpatory on their face.  *Youngblood*, 488 U.S. at 57.  In my view, this lost evidence falls squarely in the *Trombetta* bucket and should not be subject to "bad faith" analysis.

I respectfully concur.